AUGUST C. WOLF AND MURIEL M. WOLF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wolf v. Commissioner
Docket No. 28585-86
United States Tax Court
T.C. Memo 1991-212; 1991 Tax Ct. Memo LEXIS 236; 61 T.C.M. (CCH) 2608; T.C.M. (RIA) 91212; May 15, 1991, Filed *236 Decision will be entered for the respondent. Henry D. Nunez, for the petitioners. Steven A. Wilson, for the respondent. WRIGHT, Judge. WRIGHT
MEMORANDUM FINDINGS OF FACT AND OPINION By notice of deficiency dated April 15, 1986, respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Additions to Tax and Increased Interest
Year
Deficiency
6653(a) [1]
6653(a)(1)
6653(a)(2)
6659
6621(c)
1979
$ 3,199.00
$ 160.00  n/a n/a $ 960.00  ** 1980
778.00
39.00
n/a n/a n/a n/a
1981
2,411.00
n/a
$ 121.00  * 723.00
** 1982
7,790.84
n/a
390.00
* 2,337.00  ** Petitioners have conceded: (1) That they are not entitled to investment tax credit *237 from their investment in a master record lease, and (2) that respondent correctly determined the fair market value of the master recording at issue. The issues for decision are: (1) Whether petitioners entered into a master record leasing transaction with the actual and honest objective of making a profit, and are therefore entitled to deduct claimed business expenses under section 162; (2) whether petitioners are liable for the additions to tax for negligence or intentional disregard of rules and regulations under section 6653(a), (a)(1), and (a)(2); (3) whether petitioners are liable for a valuation overstatement addition to tax under section 6659 for taxable years 1979, 1981, and 1982; (4) whether petitioners are liable for increased interest under section 6621(c); (5) whether the statute of limitations for assessing petitioners' income tax liabilities for the years at issue expired prior to issuance of the notice of deficiency; (6) whether respondent's failure to publish Treasury Delegation Order 150-10 invalidates the determination of additions to tax; (7) whether petitioners and respondent entered into a settlement agreement prior to trial; (8) whether the TEFRA partnership *238 procedures under sections 6221 through 6233 are applicable; and (9) whether petitioners asserted positions which are frivolous and groundless and are therefore liable for a penalty under section 6673. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts, first supplemental stipulation of facts, second supplemental stipulation of facts, third supplemental stipulation of facts, and attached exhibits are incorporated herein. Petitioners resided in Fresno, California, when they filed their petition in this case. Petitioner (all references to petitioner are to August C. Wolf) has been in the investment and insurance business since 1964. Petitioner is a C.L.U., which is a license received after completing a course of training which includes the study of tax, life insurance, and economics. During 1982, petitioner was self-employed as an insurance agent. Encore Leasing Corporation
Encore Leasing Corporation (Encore) was incorporated on February 1, 1982. Encore is in the business of leasing master recordings of previously released pop and Gospel albums. Clint Collings (Collings) was the president and sole shareholder of *239 Encore during the years at issue. Encore's prospectus for 1982 consists of 32 pages, of which 14 pages are cover sheets, table of contents, and blank forms. Tax benefits are discussed on 16 of the remaining 18 pages. Although page 1 of the prospectus refers to an "exciting business opportunity while taking advantage of current tax laws," it mentions very little about said opportunity, while it strongly emphasizes the benefits to be derived from the investment tax credit. Page 5 of the prospectus, a letter from Henry D. Nunez (Nunez), an attorney, states that the Encore program "will provide an excellent opportunity to make a profit for individuals with creativity and determination. Present tax laws provide this opportunity." The letter further emphasizes that the "immediate benefit" of the Encore program "is a reduction of current income tax liability," and explains that investment tax credit reduces tax liability on a dollar-for-dollar basis, can be carried back or forward to reduce tax liabilities, and entitles the taxpayer to a "quick refund." Encore's promotional material for 1982 also includes a 32 page "Tax Opinion" prepared by Nunez. Nunez's tax opinion concludes by stating: *240 It is advisable that, as a matter of ordinary business prudence, each potential Lessee consult his own financial, accounting, legal and tax advisors prior to any Lease of a Master Recording, with regard to the application of this opinion in his own particular circumstances and with regard to matters not covered herein.
Encore's prospectus contains only one page which discusses, in general terms, the record industry. The prospectus does not specifically address the master recordings which Encore intended to lease, nor any other facets of the Encore program. Potential investors are warned on page 7 that they should make certain that the lessor (Encore) has "the right to enter into the sale or lease agreement." The prospectus further advises potential investors that the "quality of the album and how it is marketed are two key factors which most determine its success." There is no information regarding the quality of the master recordings which Encore actually intended to lease. The "Financial Section" of the prospectus compares the rate of return available through the lease program with certificates of deposit. The analysis of the rate of return from the lease program focuses *241 on tax benefits, and states that 84 percent of the return on investment from the lease program is attributable to tax benefits. The analysis states that the lease program will provide a 115.45 percent 5-year return on investment. There is no analysis in the prospectus of the potential nontax, economic profitability of its leasing program. Also, there is no information in the prospectus regarding the marketability of the master recordings which it intended to lease, or any information of how master recordings should be marketed, other than general information on page 7 regarding the "traditional means" of selling albums. Petitioner had a copy of the Encore prospectus when he made his investment in Encore. Finally, the materials provided by Encore include a list of recommended steps for "business start-up." There is no explanation how these steps, which include subscribing to Rolling Stone magazine and printing business cards, are to assist in the success of the venture. The 15 steps are intended to help establish profit objective in case of an audit by respondent. Petitioner learned about Encore through Joanne Collings, who is Clint Collings wife. Within a week, Joanne Collings *242 introduced petitioner to Dan Ozier, a salesman for Encore. Neither Clint Collings, Joanne Collings, nor Dan Ozier had any experience in the music recording industry. Petitioner was told by Ozier that, for a cash investment of $ 10,000, he would receive an investment tax credit in taxable year 1982 in the amount of $ 17,142. On June 25, 1982, petitioner delivered a personal check in the amount of $ 10,000 to Collings. The purpose of the check was to purchase a one-seventh share in an Olivia Newton-John master recording (the master). The receipt received from Encore regarding the investment on June 25, 1982, refers only to an Olivia Newton-John master recording. It does not identify song titles or the name of the album. Petitioner did not consult with anyone other than Ozier prior to his investment with Encore. Petitioner did not discuss the Encore program with Collings until 2 or 3 weeks after he had made his investment. The only steps petitioner took to verify the background of Collings or of Encore was to ask a fellow insurance salesman what he knew of Collings. The salesman told petitioner that Collings was an "up front guy." Petitioner did not make any further inquiries *243 into Collings' background or experience. Petitioner utilized his own volumes of Research Institute of America's Tax Guide to arrive at the conclusion that master recordings could, under the proper circumstances, qualify for the investment tax credit. Petitioner also relied on Encore's tax opinion. Petitioner did not consult with anyone regarding the economic viability of the program. Petitioner has never seen the actual master recording in which he invested. Petitioner does not know where the master was produced, or the cost of its production. The only investigation of the value and marketability of the master conducted prior to investing was to ask his son's friends, none of whom had any experience in the music business, whether Olivia Newton-John was popular. The only factor considered regarding the marketability of the master recording was the name of the artist. Petitioner did not know any of the song titles on the master prior to investing. Neither petitioner nor his spouse had any experience in the music recording industry prior to their involvement with Encore. The Lease Agreement
Petitioner invested in the master through a partnership promoted by Encore named *244 O.J.N. Recording Enterprises (OJN). The OJN partnership agreement, which was prepared by Nunez, was executed by the partners on July 29, 1982. Petitioner, who was the managing partner of OJN in 1982, had a 14.19 percent interest in the partnership. There were a total of 15 partners in OJN. On July 29, 1982, OJN received a capital contribution from the partners in the amount of $ 500. Additionally, OJN paid Encore $ 66,000. On July 30, 1982, petitioner executed a lease on behalf of OJN Records for the master recording. The lease was executed on behalf of Encore by Collings on July 30, 1982. Also on July 30, 1982, Collings, as president of Encore, and petitioner, as managing partner of OJN, executed a form titled "Election to Pass Investment Tax Credit from Lessor to Lessee." Petitioner first furnished the song titles to the other partners of OJN by letter dated October 11, 1982. The term of the lease between OJN and Encore was for 61 months. OJN agreed to pay $ 66,000 as advance rent for the first 6 months and the last month of the lease. The only additional lease payments which OJN was required to make were 47 percent of the gross receipts it received from the sale of recordings. *245 Encore agreed to pass through the investment tax credit based on a fair market value of $ 1,200,000 to OJN. The lease between OJN and Encore was not exclusive, which is unusual in the record industry. Paragraph 19 of the lease merely provides that prior to the execution of the lease, Encore had not entered into a lease, or otherwise encumbered its rights to the master. There is no restriction prohibiting Encore from entering into another lease for the same master subsequent to the execution of the lease between OJN and Encore. The lease was prepared by Encore. Petitioner did not have anyone review the lease prior to his signing the agreement. The lease was not negotiable, nor was the amount of the lease payment. When he entered into the lease, petitioner was unaware of the difference between an exclusive lease and a nonexclusive lease. In addition, he did not understand the restrictions pertaining to OJN's use of the master recording. Petitioner did not receive any appraisals regarding the master until October 8, 1982. The two appraisal reports which petitioner received were both addressed to Encore, and were provided to petitioner by Collings. The Encore prospectus provides *246 that the appraisals are not to be used to establish the value of the master for tax purposes. The first appraisal report was prepared by Don Tweedy and is dated September 20, 1982. The report makes no mention of whether Tweedy listened to the master, or analyzed the quality of said master. The report also makes no mention of the packaging of the album. Finally, the report makes no mention of the appraisal method utilized by Tweedy to arrive at a market value of $ 1,800,000. A second appraisal report was prepared for Encore by Brad McCuen. The report is dated September 24, 1982. The report does not state whether McCuen listened to the master, nor is there mention of the quality of the master. McCuen also does not discuss the quality of the packaging, or the appraisal method he utilized to arrive at a value of $ 1,600,000. Petitioner accepted these appraisal reports at face value. His only inquiries regarding their validity were made to Collings. The fair market value of the master as of the date of the lease was $ 25,000, if the rights of OJN to the master were exclusive. OJN did not have exclusive rights to said master, and the actual fair market value is therefore much *247 lower. Although petitioner had a concern about Encore's title to the master, and made an inquiry, he did not receive a response to his inquiry until long after OJN had already entered into the lease for the master. Nunez, on behalf of Encore, informed petitioner by letter dated October 13, 1982, that Encore would not release the documents pertaining to the chain of title to the master because "the completed forms would divulge the seller's identity." However, Nunez did state that said documents were available upon request "in case of audit." Petitioner did not seek any further advice regarding the chain of title to the master. The chain of title to the master is as follows: Date
Amount of Consideration
Seller (Lessor)
Buyer (Lessee)
12/23/80
Unknown Al M. Biaggi
Memory Productions,
Inc.
04/14/81
Unknown Memory Productions,
El Dorado
Inc.
09/15/82
$ 8,750
El Dorado
AJK Enterprises
08/03/82
1,200,000  AJK Enterprises
Encore Leasing
07/30/82
66,000
Encore Leasing
OJN Records
Encore's consideration to AJK Enterprises for the master recording consisted of $ 19,583.33 in cash and an unsecured promissory note for $ 1,180,416.60. The use of an unsecured *248 promissory note to pay for over 99 percent of the sale price of a master is highly unusual in the music recording industry. The promissory note which Encore issued to AJK Enterprises as part of the consideration for the master recording is due on August 3, 1994. The promissory note provides for interest at the rate of 9 percent per annum. The only payments required on the promissory note are 25 percent of the gross receipts which Encore received from exploitation of the master. Petitioner had never seen a copy of the master purchase agreement between Encore and AJK Enterprises, dated August 3, 1982, until the trial of this case. The master purchase agreement between Encore and AJK Enterprises contains language which is not typically found in agreements in the music industry. The agreement places the following conditions and restrictions on Encore's use of the master: To be manufactured and sold in set configuration as per schedule "A ONLY".
Schedule A is a list of 10 song titles. Due to the restrictions in the master purchase agreement, the only right which AJK Enterprises conveyed to Encore was the right to manufacture and sell all 10 songs on the master in the *249 exact same order as set forth on the Schedule A attached to that agreement. Encore could not alter that configuration without being in breach of the agreement. These restrictions are never seen in standard agreements in the music industry. Since AJK Enterprises only sold Encore the right to sell the 10 songs in the order stated on Schedule A, AJK Enterprises could have resold those same 10 song titles, but in different sequences, to millions of different investors. The lease between OJN and Encore identifies the master only by the name of the recording artist. The lease did not contain any reference to song titles. Such a lease is not a typical agreement in the music industry. The lease prohibits OJN from making "any alterations, additions or changes to the equipment in any respect, without the prior written consent of the lessor." Paragraph 15 of the lease contains the following restriction: Further, the lessee is subject to the restrictions and royalty obligations described in Schedule 2 of Master Purchase Agreement executed by lessor and incorporated herein by reference.
A copy of the master purchase agreement between AJK and Encore was not attached to the lease. *250 Petitioner was provided a list of record distributors by Collings. Among the distributors was the Tony Lawrence Marketing & Record Distribution Agency (Tony Lawrence Agency). Petitioner personally interviewed Tony Lawrence (Lawrence) prior to signing an employment agreement with the agency. Petitioner chose the Tony Lawrence Agency because the other distributors on the list could not guarantee that they would get the master into production before Christmas (which the Tony Lawrence Agency also failed to do). The only inquiries petitioner made regarding the qualifications of Lawrence were to Collings. Other than interviewing Lawrence and reviewing his resume, petitioner took no steps to investigate or verify his credentials. On August 30, 1982, petitioner, on behalf of OJN, entered into an employment agreement with the Tony Lawrence Agency to distribute the master. The distribution agreement and fee between OJN and the Tony Lawrence Agency was not negotiable. Lawrence prepared the employment agreement which he and petitioner, on behalf of OJN, executed. The fee for the Tony Lawrence Agency's service was $ 4,500. The employment agreement between OJN and the Tony Lawrence Agency *251 is a "vanity publishing agreement," which represents 1 percent or less of the music business. A vanity publisher is utilized if a distributor for music cannot be found and the person in possession of the recordings is willing to pay for the production of a specified numbers of copies. Paragraph 3 of the employment agreement grants the Tony Lawrence Agency the sole discretion to determine the wholesale and suggested retail price at which records were to be sold. The employment agreement requires the Tony Lawrence Agency to manufacture "a sufficient quantity of records * * * to exploit, advertise, and promote the record, as deemed necessary by Tony Lawrence Agency." In addition, the employment agreement requires the Tony Lawrence Agency to make records available for distribution and sale, to make periodic phone contact with distributors, one stops, and sales contacts, to manufacture and ship the product, to collect and disburse monies from sales, and to use reasonable effort in its promotion and sale of the record. Paragraph 9 of the employment agreement provides that OJN owns the entire right, title, and interest in the master. Since OJN's rights were limited to those which Encore *252 received from AJK Enterprises, this portion of the employment agreement is inaccurate. The Tony Lawrence Agency initially pressed 2,000 albums from the master. Only 13 of the albums were sold from 1982 through December 31, 1984. OJN received $ 13.20 from the sale of the albums on February 21, 1984. Pursuant to OJN's lease agreement with Encore, OJN paid 47 percent of its gross receipts, or approximately $ 6.20, to Encore. OJN would have to sell 122,571 records in order to realize a profit on the lease fee it paid to Encore. OJN would have to sell 1,573,888 records for Encore to pay the principal due on the promissory note to AJK Enterprises. OJN's Partnership Returns of Income (Form 1065) for taxable years 1982 through 1984 indicate that OJN commenced business on July 30, 1982. OJN's Forms 1065 for the years 1982 through 1987 reflect the following gross receipts and expenses: Year
Gross Receipts Rent Miscellaneous Deductions
1982
-0-
$ 47,143.00  $ 477.00  1983
-0-
18,857.00
4,755.00  1984
$ 132.00   -0-
505.00
1985
68.00
-0-
815.70
1986
-0-
-0-
754.73
1987
51.45
-0-
1,093.28  Petitioners reported adjusted gross income of $ 74,956.13 *253 on their Federal income tax return (Form 1040) for taxable year 1982. . After claiming deductions and credits, petitioners reported a tax liability of zero and received a refund of $ 1,482.87. Petitioners received tax benefits from OJN in 1982 in the form of a loss of $ 6,752 and investment tax credit of $ 17,016. Thus, petitioners immediately received practically double their cash investment in tax benefits for the first year alone. Petitioners filed a Form 1045 (Application for Tentative Refund) with their Federal income tax return for 1982. Due to claimed investment tax credit carrybacks, to which petitioners have conceded they are not entitled, petitioners claimed refunds for the years 1979, 1980, and 1981 in the respective amounts of $ 2,969, $ 778, and $ 2,411. OPINION This case is a test case for numerous taxpayers who invested in the Encore master recording lease program. Profit Objective
In order to find that the activity was engaged in for profit under section 183, it must be established that the investors had an actual and honest objective of making a profit. Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *254 Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be allowed. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Since the issue is whether petitioners are entitled to deduct their pro rata share of the partnership loss, they must establish that the partnership was entitled to the claimed deductions for the years at issue. In order to determine whether section 183 disallows such deductions, we will look at the actions taken by petitioner as managing partner of OJN to determine the partnership's profit objective. Fox v. Commissioner, 80 T.C. 972, (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1987), *255 affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5, 6-7, 9 (3d Cir. 1984); Siegel v. Commissioner, 78 T.C. 659, 698 (1982). Profit means economic profit, independent of tax savings. Surloff v. Commissioner, 81 T.C. 210, 232-233 (1983). While there need not be a reasonable expectation of profit, the profit objective must be bona fide. Fox v. Commissioner, supra at 1006. Profit objective is a fact to be determined from all of the facts and circumstances. Independent Electric Supply v. Commissioner, 781 F.2d 724 (9th Cir. 1986). Greater weight is given to objective facts than to the taxpayer's mere statements of intent. Beck v. Commissioner, 85 T.C. 557, 570 (1985). Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of relevant factors, which are in large part a synthesis of prior case law, to be considered in *256 determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). Manner In Which The Taxpayer Carries On The Activity
Encore's promotional materials focus primarily on tax benefits. There is no analysis of the marketability, or *257 the quality, of the master recordings, even though Encore's prospectus identifies these two factors as being key elements in whether the program is successful. Petitioner never investigated the master to determine if those factors were present. Petitioner relied solely upon the representations of Collings and Ozier prior to investing in Encore. Neither of these individuals has any experience in the music recording industry. Even though petitioner read the Encore prospectus and tax opinion which stated that the basis for the tax benefits of the investment was tied to the fair market value of the master, and that the appraisals supplied by Encore were not to be used to establish fair market value for tax purposes, petitioner never obtained an independent appraisal of the master recording. Petitioner did not even receive appraisals from Encore until approximately 2 months after the partnership had leased the master recording. In addition, although petitioner testified that he was concerned with the chain of title to the master, he did not receive a response to his request to Encore regarding title until 2 months after OJN had leased the master. On that date Nunez, on behalf of *258 Encore, advised petitioner that Encore would not provide copies of the documents pertaining to its purchase of the master. Had petitioner insisted on examining the chain of title, he would have known that AJK purchased the master for $ 8,750. Even though the lease entered into by OJN specified that the lessee was subject to the restrictions described in Schedule 2 of the Master Purchase Agreement executed by Encore and AJK Enterprises, petitioner never asked to examine the Master Purchase Agreement. Had he done so, he would have realized that AJK could sell the same master to millions of investors. The only factors petitioner considered regarding the marketability of the master recording were comments by his son's friends that Olivia Newton-John was popular. Petitioner did not consult anyone with experience in the music business regarding the quality or marketability of the master recording. All of the foregoing factors indicate that OJN was operated in an unbusinesslike fashion. Had petitioner investigated the investment with due diligence, the unlikelihood of realizing an economic profit would have been clear. We conclude that petitioner did not consider OJN a business, but *259 rather a tax avoidance device. The Expertise Of The Taxpayer Or His Advisors
Preparation for the activity by extensive study of its accepted business, economic, and scientific practices, or consultation with those who are expert therein, may indicate that the taxpayer has a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs.
Not only did petitioner not prepare for the record business by extensive study, he remained ignorant of its accepted business, economic, and scientific practices throughout his investment, as is made clear by his execution of contracts with highly unorthodox terms and his employment of a "vanity publisher" as distributor. Neither petitioner, nor any of the individuals he consulted, had any experience in the music recording industry. Additionally, petitioner did not consult any experts to evaluate the economic viability of the program. Time And Effort Expended By The Taxpayer In Carrying On The Activity
The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or *260 recreational aspects, may indicate an objective to derive a profit. A taxpayer's withdrawal from another occupation to devote most of his energies to the activity may also be evidence that the activity is engaged in for profit. The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit objective where the taxpayer employs competent and qualified persons to carry on such activity. Sec. 1.183-2(b)(3), Income Tax Regs.
Petitioner devoted very little of his energies to the activity, continuing to devote all of his working hours to his insurance business. Petitioner did not take the time to verify the chain of title to the master, even after being put on notice by Nunez' refusal to divulge the chain. In addition, petitioner and OJN did little to monitor the activities of its distributor. Despite a lack of sales, OJN did not express its dissatisfaction with the Tony Lawrence Agency's performance until May 4, 1983. Finally, petitioner has failed to show that he employed, or even consulted, any competent and experienced persons to assist him in the venture. Expectation That Assets Used In The Activity May Appreciate *261 In Value
The term "profit" encompasses appreciation in the value of assets, such as land, used in the activity. Thus, the taxpayer may intend to derive a profit from the operation of the activity, and may also intend that, even if no profit from current operations is derived, an overall profit will result when appreciation in the value of land used in the activity is realized since income from the activity together with the appreciation of land will exceed expenses of operation. Sec. 1.183-2(b)(4), Income Tax Regs.
The master was so grossly overvalued that there could be no hope that it would ever obtain a value remotely close to the value claimed by OJN. Furthermore, since OJN never obtained an independent appraisal, and did not obtain appraisals at all until months after it had entered into the lease agreement, it is clear that OJN was not concerned with the economic value of the master. Petitioner introduced no testimony or documentary evidence indicating that he expected the master to appreciate in value. The Success Of The Taxpayer In Carrying On Other Similar Or Dissimilar Activities
The fact that the taxpayer has engaged in similar activities in the past and converted *262 them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable. Sec. 1.183-2(b)(5), Income Tax Regs.
Neither petitioner nor anyone associated with Encore had any experience in regards to the music industry. Petitioner had engaged in a series of activities since leaving high school. However, these activities are in no way similar to the OJN venture, and no evidence was introduced indicating he had made these activities, other than his insurance business, profitable. The Taxpayer's History Of Income Or Losses With Respect To The Activity
A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable as due to customary business risks or reverses, may indicate that the activity is not being engaged in for profit. A series of years in which net income is realized would be strong evidence that the activity *263 is engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.
OJN reported gross receipts from the years 1982 through 1987 in the total amount of $ 251.45. During the same period, OJN claimed rent and miscellaneous deductions in the amount of $ 74,400.71. Additionally, OJN passed through $ 120,000 of investment tax credit to its partners. Petitioner never realized an economic profit from the activity, and introduced no evidence showing that continued losses are customary in entering into the record business. The Amount Of Occasional Profits, If Any, Which Are Earned
The amount of profits in relation to the amount of losses incurred, and in relation to the taxpayer's investment and the value of the assets used in the activity, may provide useful criteria in determining the taxpayer's objective. An occasional small profit from an activity generating large losses, or from an activity in which the taxpayer has made a large investment, would not generally be determinative that the activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs.
An opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate *264 that the activity is engaged in for profit even though losses or only occasional small profits are actually generated. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioner made no profits, and introduced no evidence showing an opportunity to earn a substantial ultimate profit. The Financial Status Of The Taxpayer
The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.
Petitioners reported total income on their 1982 return in the amount of $ 74,956.13. After deductions and credits, their tax liability for 1982 was zero. Due to deductions and investment tax credit, petitioners received refunds in the amount of $ 1,482.87 for 1982, $ 2,411 for 1981, $ 778 for 1980, and $ 2,969 for 1979. Petitioners' significant income in 1982 is indicative of their purpose in investing in the Encore program, which guaranteed tax benefits and only peripherally referred to profits. Elements Of Personal Pleasure Or Recreation
We find that this element is inapplicable to the instant case. See sec. 1.183-2(b)(9), Income Tax Regs.
In conclusion, we *265 find that every facet of petitioner's investment in OJN, and of OJN's investment in the master, indicates that petitioner was motivated by the supposed tax benefits of the transaction. In order for OJN to have realized a profit on the master, it would have had to sell 122,571 albums. At the rate albums were being sold, it would take 20,428 years for OJN to recover its lease fee. In addition, given the necessity of selling over 100,000 albums, petitioner has not explained why OJN only printed 2,000 albums during the initial years of operations. Overall, there is nothing to indicate that petitioner's objective was realizing a profit, and we therefore affirm respondent's determination. Additions To Tax Under Section 6653(a), (a)(1), and (a)(2)
Section 6653(a) and, beginning with taxable year 1981, section 6653(a)(1), provide for an addition to tax equal to 5 percent of any underpayment if any part of the underpayment is due to negligence or intentional disregard of rules and regulations. Beginning with taxable year 1981, section 6653(a)(2) provides for an addition to tax equal to 50 percent of the interest payable on the deficiency with respect to the portion of the underpayment *266 which is attributable to negligence or intentional disregard of rules and regulations. Negligence under section 6653(a),(a)(1), and (a)(2) is the lack of due care or the failure to act as a reasonable person would act under the same circumstances where there is a legal duty to act. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners bear the burden of proving that no part of the underpayments for the years at issue is due to negligence or intentional disregard of rules and regulations. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757 (1972). While petitioners claim to have engaged in the commercial development of the master, they had no experience in the industry and paid little attention to their investment. They were unfamiliar with the recording artist who performs on the master. They did not seek independent advice about the financial merit of leasing the master. Petitioners did not listen to the master prior to leasing it nor did they seek independent appraisals, even though the Encore prospectus informed them that the basis for purposes of investment tax credit is dependent upon the value of the asset. They did not inquire *267 as to the date and the circumstances under which the master was recorded. They did not inquire about the experience of Collings in the music industry. They did not inquire about past successes or failures in the Encore program. While petitioner did inquire about the chain of title to the record, he did not pursue the matter when Nunez refused to provide it. This in itself should have warned petitioner that the investment had no value. Petitioners' actions do not approach the actions which a reasonable and ordinarily prudent person would have taken under the circumstances. We find that petitioners have failed to prove that any part of the underpayments for the years at issue was not due to negligence or intentional disregard of the rules and regulations. Respondent's determination regarding the additions to tax under section 6653(a), (a)(1), and (a)(2) is therefore sustained. Addition To Tax For Valuation Overstatement Under Section 6659
Section 6659(c) defines "valuation overstatement" to include the claim on a return of a value of 150 percent or more of the correct value. The amount of the addition equals the applicable percentage, as determined under section 6659(b), *268 of the underpayment so attributable. Sec. 6659(a). In the instant case the value claimed is more than 250 percent of the correct value, and therefore the applicable percentage is 30. Petitioners conceded prior to trial that the master was overvalued. In addition, petitioners conceded that respondent's valuation of the master is correct. However, petitioners contend that the section 6659 addition to tax is inapplicable because the master was not "new section 38 property," thus disqualifying it for the investment tax credit due to section 48(d)(1), and that therefore, the rationale set forth in the cases of Todd v Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), and Gainer v. Commissioner, T.C. Memo 1988-416, affd. 893 F.2d 225 (9th Cir. 1990), precludes the applicability of section 6659. See also Irom v. Commissioner, 866 F.2d 545 (2d Cir. 1989); McCrary v. Commissioner, 92 T.C. 827 (1989). That is, petitioners argue that the underpayment in the instant case is attributable to section 48(d)(1), not to a valuation overstatement, and that therefore *269 section 6659 is inapplicable. With respect to certain leased property, section 48(d)(1) provides as follows: GENERAL RULE. -- A person (other than a person referred to in section 46(e)(1)) who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect with respect to any new section 38 property (other than property described in paragraph (4)) to treat the lessee as having acquired such property * * * [Emphasis added.]
"New section 38 property" is defined by section 48(b) as section 38 property: (1) the construction, reconstruction, or erection of which is completed by the taxpayer after December 31, 1961, or (2) acquired after December 31, 1961, if the original use of such property commences with the taxpayer and commences after such date.
Petitioners' argument, first raised in their opening brief, that the master is not "new section 38 property" is based on a statement made by respondent's expert witness that the songs on the master "were probably recorded in 1971 at the beginning of her career to facilitate her obtaining a recording contract." However, the fact that *270 these recordings have not been previously released is supported by the expert witness's statement that the recordings "were not intended for commercial release." Respondent's expert witness testified that because of their poor production quality the songs on the master were most likely intended as demonstration tapes, and thus were never marketed. Petitioners have introduced no evidence whatsoever that the master is not "new section 38 property." As part of its agreement with OJN, Encore verified that the configuration of songs on the master had never previously been sold or leased. The prospectus specifies that Encore purchased only "new" master recordings. In addition, due to Encore's agreement with AJK the same 10 songs could be sold in millions of different configurations, and thus the odds of a previous sale or lease of the songs in the same configuration as the master are extremely low. We therefore reject petitioner's argument that the underpayment in the instant case is attributable to disqualification under section 48(d)(1) for failure to constitute "new section 38 property," rather than to a valuation overstatement. Because the value claimed on petitioners' Federal *271 income tax return in each of the years in issue exceeds the correct value determined in each such year by more than 150 percent, and because the underpayments resulting from the valuation overstatement exceed $ 1,000 in taxable years 1979, 1981, and 1982, we sustain respondent's determination of the addition to tax under section 6659. Increased Interest Under Section 6621(c)
Section 6621(c) provides for an increased rate of interest where there is an underpayment of taxes in excess of $ 1,000 attributable to one or more enumerated "tax motivated transactions" in any year. Section 6621(c) applies to interest accruing after December 31, 1984, even though the transaction was entered into before the date of the enactment of 6621(c). Gantner v. Commissioner, 91 T.C. 713, 731 (1988), affd. 905 F.2d 241 (8th Cir. 1990); Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Tax motivated transactions include valuation overstatements within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Pursuant to section 6621(c)(3)(B), any deduction disallowed *272 under section 183 constitutes a tax motivated transaction. See sec. 301.6621-2T, Q & A 4(1), Temp. Proced. & Admin. Reg., 49 Fed. Reg. 50392 (Dec. 28, 1984). We have held that the underpayments on petitioners' Federal income tax returns were due to valuation overstatements as defined by section 6659(c) and that the underpayments on petitioners' returns attributable to such valuation overstatements exceed $ 1,000 in taxable years 1979, 1981, and 1982. We therefore hold that the increased rate of interest determined under section 6621(c) applies to the underpayments caused by such valuation overstatements. Assessment Of The Adjustments Set Forth In The Notice of Deficiency Is Not Barred By The Statute Of Limitations
Section 6501(a) provides that, except as otherwise provided in such section, the amount of any tax imposed shall be assessed within 3 years after the return was filed, whether or not such return was filed on or after the date prescribed. Section 6501(b)(1) provides that, for purposes of such section, a return of tax filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered *273 as filed on such last day. Section 6072(a) provides that in the case of income tax returns, returns made on the basis of the calendar year shall be filed on or before the 15th day of April following the close of the calendar year. Section 6501(j) provides that in the case of a deficiency attributable to the application to the taxpayer of a credit carryback, such deficiency may be assessed at any time before the expiration of the period within which a deficiency for the taxable year of the unused credit which results in such carryback may be assessed, or with respect to any portion of a credit carryback from a taxable year attributable to a net operating loss carryback, capital loss carryback, or other credit carryback from a subsequent taxable year, at any time before the expiration of the period within which a deficiency for such subsequent taxable year may be assessed. Respondent bears the burden of proving that the notices of deficiency were timely mailed. August v. Commissioner, 54 T.C. 1535, 1536 (1970). Petitioners' 1982 Federal income tax return was due to be filed on or before April 15, 1983. Accordingly, the earliest that the statute of limitations *274 could have expired in regard to their 1982 tax year was April 15, 1986. Respondent mailed notices of deficiency for the 1979, 1980, 1981, and 1982 tax years on April 15, 1986, as evidenced by U.S. Postal Service Form 3877. Postal Form 3877 is proof that respondent properly mailed the notices of deficiency by certified mail to petitioners' last known address. Keado v. United States, 853 F.2d 1209 (5th Cir. 1988); United States v. Zolla, 724 F.2d 808, 810 (9th Cir. 1984); Coleman v. Commissioner, 94 T.C. 82 (1990). The adjustments in respondent's notice of deficiency for 1979, 1980, and 1981 are clearly identified as being attributable to the carrying back of investment tax credit from 1982, as provided in section 6501(j). We find that respondent timely and properly mailed his notices of deficiency on April 15, 1986. Accordingly, the assessment of the adjustments set forth in said notice of deficiency is not barred by the statute of limitations. OJN Is Not Subject To The TEFRA Partnership Procedures Set Forth In Sections 6221 Through 6233
All partnerships required to file returns under section 6031(a) and whose *275 tax years begin after September 3, 1982, are subject to the procedures set forth in sections 6221 through 6233, commonly referred to as the TEFRA partnership procedures. Petitioners contend that OJN commenced business after September 3, 1982, and therefore its tax year began after that date. Accordingly, petitioners argue, respondent was required to comply with the TEFRA partnership procedures. Some of the factors which this Court has considered in determining the formation date of a partnership are the date on which capital contributions are made and the date on which major operating assets are acquired. Frazell v. Commissioner, 88 T.C. 1405 (1987). The documentary evidence establishes that OJN commenced business prior to September 3, 1982. The facts supporting this conclusion are as follows: (1) When petitioner delivered his check to Encore on June 25, 1982, Encore stated that he had purchased a one-seventh share in the master; (2) on July the OJN partnership agreement was executed; (3) on July 30, 1982, OJN entered into a lease with Encore for the master; (4) OJN's cash disbursements journal reflects that $ 66,000 in cash was paid to Encore on July 29, *276 1982; (5) Encore executed an Election to Pass Investment Tax Credit to OJN on July 30, 1982; (6) OJN's Federal income tax returns provide that the partnership commenced business on July 30, 1982; (7) OJN executed an employment agreement with the Tony Lawrence Agency on August 30, 1982. Based on the foregoing factors, it is clear that by August 30, 1982, OJN had completed all steps to obtain rights to the master and had entered into an agreement for the production and distribution of albums. Since OJN commenced business prior to September 3, 1982, it is not subject to the TEFRA partnership provisions, and respondent properly issued a notice of deficiency adjusting petitioners' claimed deductions and investment tax credit.
Form 870 Does Not Preclude Respondent From Issuing A Notice Of Deficiency For A Year Covered By Said Agreement
Respondent is authorized by section 7121 to enter into a written agreement "with any person relating to the liability of such person (or of the person or estate for whom he acts) in respect of any internal revenue tax for any taxable period." Sec. 7121(a). The foregoing section is the "exclusive procedure under which a final closing agreement as *277 to the tax liability of any person can be executed." Estate of Meyer v. Commissioner, 58 T.C. 69, 70 (1972); see also Botany Worsted Mills v. United States, 278 U.S. 282, 288, 73 L. Ed. 379, 49 S. Ct. 129 (1929). Petitioner claims that the Form 870 (Waiver of Restrictions on Assessment and Collection of Deficiency and Tax and Acceptance of Overassessment) he executed for the years 1979 through 1982 precludes respondent from issuing a notice of deficiency for said years. However, although petitioner claims that he believed that a the Form 870 was final, the first full paragraph on that form under the heading "General Information" advises, in part, as follows: Your consent will not prevent you from filing a claim for refund (after you have paid the tax) if you later believe you are so entitled. It will not prevent us from later determining, if necessary, that you owe additional tax; nor extend the time provided by law for either action.
As the foregoing language illustrates, neither party was limited by the terms set forth in the waiver. If petitioner decided to dispute the adjustments, the form clearly states that he could have filed a claim for refund. In *278 addition, petitioner is obviously not precluded by the form from filing a petition in this Court. The form also clearly states that respondent is not precluded from subsequently determining that petitioner owed additional tax. Accordingly, there is no language in the Form 870 limiting all subsequent activity. Joyce v. Gentsch, 141 F.2d 891 (6th Cir. 1944). The Form 870 does not constitute a binding closing agreement and therefore, respondent was not precluded or estopped from issuing his notice of deficiency. Respondent's Failure To Publish Treasury Delegation Orders 150-10 Does Not Invalidate The Assessment Of Additions To Tax By Respondent
Petitioners assert that respondent was granted authority to issue notices of deficiency pursuant to Treasury Delegation Order (TDO) 150-10, 57 Fed. Reg. 25284 (July 11, 1986), effective October 1, 1986. TDO 150-10 provides a complete list of Internal Revenue Districts. TDO 150-10 was not published in the Federal Register in accordance with section 5 of the Federal Register Act and section 3 of the Administrative Procedure Act. Therefore, petitioners argue, the Secretary of the Treasury did not *279 properly delegate to respondent authority to send statutory notices of deficiency. This Court has recently rejected petitioners' argument in Stamos v. Commissioner, 95 T.C. 624 (1990). In that opinion we held that TDO 150-10 need not be published in the Federal Register to be effective, and therefore, the Secretary duly delegated to respondent authority to send statutory notices deficiency. Based on our holding in Stamos v. Commissioner, supra, we reject petitioners' argument. Penalty Pursuant to Section 6673
Section 6673 provides that whenever it appears that proceedings before this Court have been instituted or maintained by the taxpayer primarily for delay, that the taxpayer's position in such proceedings is frivolous or groundless, or that the taxpayer unreasonably failed to pursue available administrative remedies, damages in an amount not in excess of $ 5,000 shall be awarded to the United States. As to positions taken after December 31, 1989, in proceedings which are pending on or commenced after such date, this Court may require the taxpayer to pay to the United States a penalty not in excess of $ 25,000. Omnibus Budget *280 Reconciliation Act of 1989, Pub. L. 101-239, sec. 7731(a), 103 Stat. 2106, 2400. Shortly before trial, petitioner conceded that he was not entitled to the investment tax credit which he claimed on his Federal income tax returns. In addition, petitioner accepted respondent's valuation of the master. However, a taxpayer cannot escape liability under section 6673 merely because he has conceded an issue which he would certainly have lost where the remaining issues are frivolous or groundless. A review of this case shows that all of the issues which remained in contention were groundless. The primary issue in this case is whether petitioner is entitled to certain business expense deductions under section 162. We found that petitioner was not entitled to the claimed deductions because they are attributable to an activity "not engaged in for profit" as provided by section 183(a). Many cases in this Court, almost identical to the instant case, have uniformly disallowed such claimed deductions. See McCrary v. Commissioner, 92 T.C. 827 (1989); Estate of Baron v. Commissioner, 83 T.C. 542 (1984), affd. 798 F.2d 65 (2d Cir. 1986); *281 Morrow v. Commissioner, T.C. Memo 1988-372; Avers v. Commissioner, T.C. Memo 1988-176; Lowenbach v. Commissioner, T.C. Memo 1987-496. Petitioner failed to show that the instant case differs to any degree from those cases. Also at issue are additions to tax under section 6653(a), (a)(1), and (a)(2). Again, previous, almost identical cases have held the taxpayer liable for such additions. Petitioner has been unable to distinguish such cases, or to find any statutory support for his position. Petitioner was so clearly unentitled to the deductions claimed, and was so clearly negligent in claiming said deductions, that his argument regarding negligence and intentional disregard for the rules and regulations is totally groundless. With regard to the addition to tax under section 6659 and the increased interest under section 6621(c), petitioner's argument that the underpayments at issue are attributable to the master's failure to qualify as new section 38 property was advanced only after the trial had taken placed. As already discussed, this argument is groundless because petitioner failed to introduce any evidence whatsoever *282 that the master does not qualify as new section 38 property. The very prospectus on which petitioner relied in making his investment specifies that only new section 38 property would be leased. Petitioner also argued that respondent's notice of deficiency is barred by the statute of limitations. A glance at the date of the notice of deficiency and at section 6.501(j) makes it obvious that there are no grounds for such an argument. Petitioner next argued that OJN is subject to the TEFRA partnership procedures because it commenced business after September 3, 1982. However, a review of petitioner's own documents and records establishes that OJN's tax year began before September 3, 1982, and that therefore OJN is not subject to the TEFRA procedures. An argument which is patently disproved by petitioner's own records is both frivolous and groundless. Petitioner next argued that the Form 870 which he executed precludes respondent from later determining that he owes additional tax. However, the first full paragraph of the form, which petitioner undoubtedly read before signing, makes it clear that such is not the case. Again, this argument is both frivolous and groundless. In addition, *283 in two District Court cases, John D. Weft, et al. v. Commissioner, Docket No. CVF-87-013-EDP (E.D. Cal.), and Vielbig, et al. v. Commissioner, Docket No. CVF-86-363-MDC (E.D. Cal.), which involved similar Encore partnerships, the District Court held that the taxpayers had entered into the transactions without a profit objective and accordingly disallowed all of the partnerships' claimed deductions. Petitioner's counsel litigated the Werft case and was provided a copy of the Vielbig case by respondent prior to trial. See Sydnes v. Commissioner, 74 T.C. 864, 872 (1980), affd. 647 F.2d 813 (8th Cir. 1981). In similar cases, we chose not to impose penalties under section 6673. However, we have warned similarly situated taxpayers that penalties were likely to be awarded in an appropriate case. Looney v. Commissioner, T.C. Memo 1988-332. Petitioner has advanced frivolous and groundless arguments in which he has persisted without reason. This Court does not exist as a forum for last gasp attempts at lost causes. Pursuant to section 6673, petitioners are required to pay a penalty in the amount of $ 3,000 to the *284 United States. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
**. To be determined.↩
*. 50% of the interest due on the deficiency.↩