August C. WOLF; Muriel M. Wolf, Petitioners–Appellants,

v.

COMMISSIONER INTERNAL REVENUE SERVICE, Respondent–Appellee.

No. 91–70694.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1993.

Decided Aug. 27, 1993.

Henry D. Nunez, Fresno, CA, for petitioners-appellants.

Joan I. Oppenheimer, Tax Div., U.S. Dept. of Justice, Washington, DC, for respondent-appellee.

Before: WALLACE, Chief Judge, O'SCANNLAIN and FERNANDEZ, Circuit Judges.

WALLACE, Chief Judge:

The Internal Revenue Service (IRS) challenged the returns of numerous taxpayers who invested in a tax shelter marketed by Encore Leasing Corporation (Encore). One of them, Wolf, appeals from a decision of the tax court upholding the IRS's disallowance of several deductions on Wolf's 1979–1982 federal income tax returns and affirming the IRS's assessment of additions to tax and penalties. The tax court exercised jurisdic-

tion pursuant to 26 U.S.C. §§ 6213, 6214, and 7442. We have jurisdiction over Wolf's timely appeal pursuant to 26 U.S.C. §§ 7482(a) and 7483. We affirm.

## I

Encore was incorporated on February 1, 1982, and was in the business of leasing master recordings of previously released pop and Gospel albums. Collings was its president and sole shareholder.

Encore's 32–page 1982 prospectus focused primarily on the tax advantages of investing in the Encore program. The prospectus contains only one page which discusses, in general terms, the record industry. The prospectus does not describe the specific master recordings Encore intended to lease or the nontax, economic profitability of Encore's leasing program. Encore also distributed a "Tax Opinion" prepared by attorney Nunez which advised investors to consult their "own financial, accounting, legal and tax advisors prior to any Lease of a Master Recording."

Wolf has been in the investment and insurance business since 1964. In a meeting with Ozier, a salesman for Encore with no experience in the music recording industry, Wolf was told that for a cash investment of $10,000 he would receive a $17,000 investment tax credit in 1982. On June 25, 1982, Wolf delivered a personal check for $10,000 to Collings to purchase a one-seventh share in an Olivia Newton–John master recording (master). His receipt referred only to an Olivia Newton–John master recording without identifying song titles or the name of the album.

Wolf did not consult with anyone other than Ozier prior to his investment with Encore. He did not discuss the Encore program with Collings until two or three weeks after he had made his investment. The only steps Wolf took to verify the background and experience of Collings or of Encore was to ask a fellow insurance salesman what he knew of Collings. The salesman responded that Collings was an "up front guy."

Wolf did his own tax research to conclude that master recordings could, under the proper circumstances, qualify for the investment tax credit. He also relied on Nunez's tax opinion. Wolf did not consult with anyone regarding the economic viability of the program.

Wolf has never seen the actual master recording in which he invested. He does not know where the master was produced, or the cost of its production. His only investigation into the value and marketability of the master conducted prior to investing was to ask his son's friends, none of whom had any experience in the music business, whether Olivia Newton–John was popular. Wolf did not know any of the song titles on the master prior to investing. Neither Wolf nor his spouse had any prior experience in the music recording industry.

Wolf invested in the master through a partnership promoted by Encore named O.J.N. Recording Enterprises (OJN). The OJN partnership agreement was prepared by Nunez and executed by the partners on July 29, 1982. Along with Wolf, the managing partner, there were 14 other partners in OJN. On July 29 and 30, 1982, OJN received a capital contribution from the partners; paid Encore $66,000; entered into a lease, prepared by Encore, for the master; and executed with Encore a form titled "Election to Pass Investment Tax Credit from Lessor to Lessee." As a result, Encore passed through to OJN the investment tax credit for the master based on a fair market value of $1,200,000.

The lease between OJN and Encore was not exclusive, which is unusual in the record industry. The lease merely provides that prior to the execution of the lease, Encore had not entered into a lease or otherwise encumbered its rights to the master. There is no restriction prohibiting Encore from entering into another lease for the same master subsequent to the execution of the lease between OJN and Encore.

Wolf did not have anyone review the lease prior to his signing the agreement. When he entered into the lease, Wolf was unaware of the difference between an exclusive lease and a nonexclusive lease. He also did not understand the restrictions pertaining to OJN's use of the master recording.

Wolf did not receive any appraisals regarding the master until October 8, 1982, when they were provided by Collings. The two appraisal reports Wolf received were both addressed to Encore. The Encore prospectus provides that the appraisals are not to be used to establish the value of the master for tax purposes. One appraisal was for $1,800,-000; the other for $1,600,000. Neither report mentions whether the appraiser listened to the master or analyzed its quality, discusses the album's packaging, or describes the appraisal method used. Wolf accepted these appraisal reports after asking Collings about their validity. The actual fair market value of the master was $25,000 if OJN's rights to the master were exclusive. Because OJN did not have exclusive rights to the master, the actual fair market value was much lower.

The master purchase agreement between Encore and AJK Enterprises, Encore's predecessor in title, places the following restriction on Encore's use of the master:

To be manufactured and sold in set configuration as per schedule "A ONLY".

Schedule A is a list of 10 song titles. Because of this restriction, Encore would be in breach of the agreement if it altered the song configuration set forth on Schedule A, an unknown restriction in standard music industry agreements. Since Encore purchased only the right to sell the 10 songs in the order stated, AJK Enterprises could have resold those same 10 song titles, in different sequences, to millions of other investors.

To press and distribute the record, Wolf chose the Tony Lawrence Marketing & Record Distribution Agency (Agency) from a list provided by Collings, because it was the only distributor to guarantee that the master would be in production before Christmas (which the Agency failed to do). Other than interviewing Lawrence and reviewing his resume, Wolf took no steps to investigate or verify his credentials. The employment agreement between OJN and the Agency is a "vanity publishing agreement." This type of agreement, which represents 1 percent or less of the music business, is utilized if a distributor for music cannot be found and the person in possession of the recordings is willing to pay for the production of a specified number of copies. The Agency sold only 13 albums from 1982 through 1984. OJN would have to sell 122,571 records in order to realize a profit on the lease fee it paid to Encore.

Wolf reported adjusted gross income of $74,956.13 on his Federal income tax return for taxable year 1982. After deductions and credits, Wolf reported no tax liability and received a refund of $1,482.87. The tax benefits he received from OJN in 1982 alone—a loss of $6,752 and investment tax credit of $17,016—were practically double his cash investment.

Wolf filed an Application for Tentative Refund with his Federal income tax return for 1982. Because of claimed investment tax credit carrybacks, to which Wolf has conceded he is not entitled, Wolf claimed refunds for the years 1979, 1980, and 1981 in the respective amounts of $2,969, $778, and $2,411.

The Commissioner disallowed Wolf's investment tax credit deductions and assessed additions to tax, increased interest rate, and penalties. The tax court affirmed the Commissioner's actions and imposed on Wolf an additional penalty for persisting in frivolous litigation.

## II

Wolf first challenges the tax court's finding that his investment in the Encore leasing program was not an activity primarily engaged in for profit pursuant to section 183 of the Internal Revenue Code (all statutory references are to the Internal Revenue Code of 1954 as amended and in effect for the involved years). This finding must be affirmed on appeal absent clear error. *Independent Elec. Supply v. Commissioner*, 781 F.2d 724, 727 (9th Cir.1986) (*Independent Electric*). We must uphold the tax court's finding unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Under the clearly erroneous standard, "[i]f the [tax court's] account of the evidence is plausible in light of the record viewed in its entirety, the court of

appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Service Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312, 1317 n. 7 (9th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 3056, 120 L.Ed.2d 922 *and cert. denied* — U.S. —, 112 S.Ct. 3057, 120 L.Ed.2d 922 (1992), *quoting Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985).

■ Wolf contends that the tax court improperly found that he did not have a bona fide profit motive for investing in the Encore leasing program. "The burden of proving the requisite profit motive is on the taxpayer." *Skeen v. Commissioner*, 864 F.2d 93, 94 (9th Cir.1989) (*Skeen*) Profit means economic profit, independent of tax savings. *Surloff v. Commissioner*, 81 T.C. 210, 232–33, 1983 WL 14861 (1983). It is proper to focus on the partnership level to ascertain profit motive. *See Independent Electric*, 781 F.2d at 729. Profit must be the predominant, primary or principal objective of the general partner, *Polakof v. Commissioner*, 820 F.2d 321, 323 & n. 2 (9th Cir.1987), *cert. denied*, 484 U.S. 1025, 108 S.Ct. 748, 98 L.Ed.2d 761 (1988), in this case Wolf. "The proper focus of the test to be applied ... is the taxpayer's subjective intent. However, objective indicia may be used to establish that intent." *Skeen*, 864 F.2d at 94 (citations omitted), *citing Independent Electric*, 781 F.2d at 726, *and* 26 C.F.R. § 1.183–2 (1988).

The tax court correctly focused on Wolf's subjective intent while informing its analysis by reference to the objective indicia set forth in the regulations. *See Wolf v. Commissioner*, 61 T.C.M. (CCH) 2608, 2613–16, 1991 WL 77553 (1991). Some of the facts relied on by the tax court, and many of the inferences to be drawn from undisputed historical facts, are disputed by Wolf in his brief. "At best, however, [Wolf] manage[s] only to show that [his] activities *might* have had a profit motive; [he] do[es] not show that the Tax Court was clearly erroneous in finding that the generation of large tax losses was in fact the dominant motivation behind" the Encore scheme. *Independent Electric*, 781 F.2d at

727. Some of the factors supporting the tax court's findings are: (1) "the high nominal purchase price[ ]" of the master, which has "not been shown to have any relationship to fair market value," *id.* at 728; (2) "the emphasis on projected tax losses in the marketing" of the Encore program, *id.;* and (3) the fact that despite a complete lack of experience in the recording industry, Wolf "chose to rely exclusively on the promoters' representations concerning" the quality and marketability of the master. *Skeen*, 864 F.2d at 95, *quoting Patin v. Commissioner*, 88 T.C. 1086, 1118, 1987 WL 49318 (1987).

The tax court opinion gives this issue very thorough treatment, identifying numerous other objective indicia of Wolf's tax savings motivation, including OJN's unbusinesslike manner of operation, the highly unusual nature of the lease contract between OJN and Encore, the use of a vanity publisher, and OJN's failure, until it was on notice of the IRS investigation, to keep track of the Agency's progress in distributing albums. On this record, reviewing for clear error, we must affirm the tax court's finding that realizing an economic profit was not the predominant intent of Wolf in his capacity as general partner of OJN.

### III

■ Wolf next contends that the tax court erred in determining that the deficiency notices sent to Wolf by the IRS were timely pursuant to section 6501 of the Internal Revenue Code. Whether the assessments are time-barred is subject to de novo review. *Kelley v. Commissioner*, 877 F.2d 756, 757 (9th Cir.1989) (*Kelley*).

Wolf's principal argument on this point was not addressed by the tax court in its opinion. Wolf does not dispute that the IRS sent him a deficiency notice within three years of the filing of his 1982 income tax return. Rather, he argues that for statute of limitations purposes, the controlling filing date is that of the partnership's tax return, not the returns of the individual partners. Furthermore, because the Commissioner must adjust tax liability at the source of the income, in this case the partnership, sending deficiency notices to the individual partners

was insufficient to comply with the requirements of the statute of limitations applicable to the partnership's tax return.

Wolf insists that the IRS may not adjust an individual's income tax return with respect to items pertaining to a partnership's return when the statute of limitations has run on adjusting the partnership's information return. He relies on *Kelley*, in which we held that the Commissioner "may not adjust a shareholder's return based on an adjustment to an S corporation's return when the statute of limitations has run on the S corporation's return." 877 F.2d at 759. But even if *Kelley*'s reasoning applied to partnerships, it would not assist Wolf because the Supreme Court has recently abrogated *Kelley*. In *Bufferd v. Commissioner*, —— U.S. ——, 113 S.Ct. 927, 122 L.Ed.2d 306 (1993), the Court resolved a split created when the Second, Fifth, and Eleventh Circuits declined to follow *Kelley*. The Court held "that the limitations period within which the Internal Revenue Service must assess the income tax return of an S corporation shareholder runs from the date on which the shareholder's return is filed." *Id.* —— U.S. at ——, 113 S.Ct. at 933. The Court expressly rejected *Kelley*'s policy concerns regarding finality and repose, *id.* —— U.S. at ——, 113 S.Ct. at 932, and we will give them no weight in this case. The limitations period for a partner, therefore, does not run from the date of the filing of the partnership's return. We hold that the deficiency notices sent to Wolf were timely. *See also Siben v. Commissioner*, 930 F.2d 1034, 1035–36 (2d Cir.1991) (distinguishing *Kelley*; holding that return triggering running of limitations period is that of individual partner, not that of partnership), *cert. denied*, —— U.S. ——, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991).

## IV

■ Wolf contends that the tax court erroneously determined that the partnership provisions of the Tax Equity and Fiscal Responsibility Act of 1982 (Act), Pub.L. No. 97–248, § 402, 96 Stat. 324, 648–69 (1982), are not applicable in this case. The tax court's conclusion that the partnership provisions of the Act do not apply to OJN turns on the tax court's factual findings concerning the date of the partnership's formation, an issue reviewed for clear error. *See Hensel Phelps Constr. Co. v. Commissioner*, 703 F.2d 485, 487 (10th Cir.1983).

The Act added sections 6221 through 6232 to the Internal Revenue Code, establishing a regime in which items of partnership income, loss, deductions, and credits are determined at the partnership level in a single proceeding rather than in separate proceedings with individual partners. The Act procedures were not followed in Wolf's case, and the Commissioner concedes that if these provisions are applicable here, the notice of deficiency is invalid. The provisions of the Act "apply to partnership taxable years beginning after the date of the enactment of this Act," Act § 407(a)(1), which is September 3, 1982. The date of commencement of OJN's 1982 taxable year is the date on which it was formed. *Sparks v. Commissioner*, 87 T.C. 1279, 1282, 1986 WL 22059 (1986). Thus, if OJN was formed prior to September 4, 1982, it is not subject to the partnership provision of the Act.

The tax court found as a matter of fact that the date of OJN's formation was before September 4, 1982. OJN's 1982 partnership return, signed by Wolf under penalty of perjury, states that the partnership's date of formation was July 30, 1982. Other partnership documents, including OJN's lease agreement with Encore, also indicate a formation date prior to September 4. Wolf states, "It is clear that the dates of the documents are erroneous." Wolf's argument is that the tax court could not accept his statements made under pain of perjury. The tax court's factual finding is not manifestly wrong, and we will not disturb it.

## V

■ Wolf argues that the tax court erred in holding that his execution of a Form 870 does not preclude the Commissioner from issuing a notice of deficiency for additional tax. The tax court's interpretation of the legal effect of Form 870 presents a question to be reviewed de novo.

Wolf's argument that his execution of Form 870 precluded the assessment of additional deficiencies is frivolous. The first full paragraph of the Form 870 signed by Wolf expressly states that consent to the assessment of the deficiencies shown in the waiver "will not prevent you from filing a claim for refund ... [and] will not prevent us from later determining, if necessary, that you owe additional tax." *See Commissioner v. Welch,* 345 F.2d 939, 948 (5th Cir.1965) (execution of Form 870 "does not foreclose further action by the Commissioner and the assertion of deficiency notices").

## VI

■ Wolf disputes the tax court's decision to uphold the IRS's assessment of a negligence penalty pursuant to section 6653 of the Internal Revenue Code. A penalty may be assessed against a taxpayer where any part of an underpayment of tax is due to "negligence (or disregard of rules or regulations)." I.R.C. § 6653(a)(1). "The taxpayer has the burden of proving that he did what a reasonably prudent person would do under the circumstances. The Tax Court's determination that the taxpayer failed to meet his burden of proving due care is a finding of fact, reviewed for clear error." *Skeen,* 864 F.2d at 96 (citations omitted). Unlike the profit motivation test under section 183, section 6653 focuses on an objective test for negligence.

We need look no farther than Encore's own marketing literature to hold that the tax court's findings of negligence are not clearly erroneous: the prospectus focused primarily on the tax benefits of the investment, and established on its face that a profit was highly unlikely. Many of the factors that support the tax court's finding that Wolf lacked a profit motive, set forth above, also demonstrate that the tax court did not clearly err in finding that Wolf acted negligently in claiming deductions as a result of his investment in OJN.

## VII

■ Wolf challenges the tax court's holding that he was liable for additions to tax penalties for valuation overstatements pursu-

ant to section 6659 of the Internal Revenue Code. Whether Wolf's underpayment was attributable in part to a valuation overstatement under section 6659 turns on factual findings reviewed for clear error. *Beck v. Commissioner,* 678 F.2d 818, 820 (9th Cir. 1982).

Section 6659 imposes a penalty for a tax underpayment "attributable to a valuation overstatement," which occurs when "the value of any property, or the adjusted basis of any property, claimed on any return" is overstated by at least 150%. I.R.C. §§ 6659(a), (c). Wolf conceded before trial that the master recording was overvalued. He nevertheless contends that the penalty is inapplicable to him because the master was not "new Section 38 property" as defined by section 48(d)(1) of the Internal Revenue Code. "New Section 38 Property" includes section 38 property "acquired by the taxpayer after December 31, 1961, provided that the original use of such property commences with the taxpayer and commences after such date." 26 C.F.R. § 1.48–2(a)(2) (1982).

Wolf's argument presumes that the master was placed in service before it came into the hands of OJN, so that it was not "new Section 38 property." The tax court found otherwise. The prospectus provided to Wolf stated that "Encore Leasing Corporation purchases *new* 'Master Recording Equipment' which entitles it to claim investment tax credit of ten percent of fair market value." The tax court's finding that the master was placed in service by OJN is amply supported by the record.

## VIII

■ Wolf insists that the tax court erred in finding him liable for an increased rate of interest pursuant to section 6621 of the Internal Revenue Code. We will review the tax court's imposition of an increased interest rate under section 6621 for clear error. *Cf. Lukens v. Commissioner,* 945 F.2d 92, 100 (5th Cir.1991).

Section 6621(c)(1) imposes an interest rate of 120% of the statutory rate on "any substantial underpayment attributable to tax motivated transactions," which include activi-

ties not engaged in for profit, Temp. Tres.Reg. § 301.6621–2T, Q4 (1984), as well as "any valuation overstatement." I.R.C. § 6621(c)(3)(A)(i). Wolf is liable for both valuation overstatements and claiming deductions that have been disallowed under section 183. Therefore, the tax court's imposition of the increased interest rate was not clearly erroneous.

## IX

■ Wolf's next argument is that the tax court erred in determining that the Commissioner's failure to publish certain Treasury Delegation Orders (TDOs) does not invalidate the assessments of additions to tax. This decision presents a question of law reviewed de novo.

This issue has already been decided by us: TDOs are not Presidential proclamations or documents cited for publication by the President or by an Act of Congress. Nor are they orders having "general applicability and legal effect." Rather the TDOs fall squarely within [44 U.S.C. §] 1505(a)'s express exception for orders "effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof." The TDOs had no legal impact on, or significance for, the general public. They simply effected a shifting of responsibilities wholly internal to the Treasury Department. Accordingly, we hold that the Federal Register Act does not mandate the publication of the TDOs and that, as a consequence, the government's failure to publish them does not affect the validity of the Secretary's delegation of authority to the Commissioner.

*United States v. Saunders*, 951 F.2d 1065, 1068 (9th Cir.1991). Given this recent, unambiguous precedent, Wolf's argument is frivolous and borders on bad faith.

## X

■ Lastly, Wolf contends that the tax court abused its discretion in imposing an additional penalty for maintaining frivolous

or groundless positions pursuant to section 6673 of the Internal Revenue Code. Section 6673 penalties are reviewed for abuse of discretion. *Larsen v. Commissioner*, 765 F.2d 939, 941 (9th Cir.1985) (*Larsen*).

Wolf was warned that the IRS would seek sanctions if he persisted in litigating. The Encore leasing program is the type of tax shelter that the tax court has consistently disallowed. *See, e.g., Riederich v. Commissioner*, 61 T.C.M. (CCH) 2388, 1991 WL 50160 (1991), *aff'd*, 985 F.2d 574 (9th Cir. 1993). Wolf's insistence on putting the IRS to the task of going to court, knowing all along that his positions were frivolous, warrants sanctions in this case. When taxpayers are on notice that they may face sanctions for frivolous litigation, the tax court is within its discretion to award sanctions under section 6673. *Larsen*, 765 F.2d at 941.

AFFIRMED.