T.C. Memo. 2002-7


UNITED STATES TAX COURT


ROBERT A. AND SHEILA D. ROUTON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 18999-99.                    Filed January 9, 2002.


<u>B. Paul Husband</u>, for petitioners.

<u>Daniel J. Parent</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, <u>Judge</u>:  By notice dated September 17, 1999,
respondent determined deficiencies of $29,717 and $38,195
relating to petitioners' 1994 and 1995 Federal income taxes,
respectively, and a $7,313 section 6651(a)[1] addition to tax

———————————————

    [1]Unless otherwise indicated, all section references are to
the Internal Revenue Code in effect for the years in issue, and
                                        (continued...)

relating to 1994.  The issues for decision are whether petitioners are:  (1) Entitled to certain deductions relating to their horse training and breeding activities, and (2) liable for a section 6651(a) addition to tax for 1994.

### FINDINGS OF FACT

Petitioners, husband and wife, resided in Somerset, California, at the time their petition was filed.

At all relevant times, Mrs. Routon has been a schoolteacher.  Mr. Routon worked on his grandfather's farm as a youth, majored in zoology in college, and, after college, worked as a veterinarian's assistant.  He created two successful businesses:  a newspaper distributorship that he sold in 1976; and American Leak Detection (ALD), a water leak detection business.  Both businesses operated profitably without a written business plan.  In 1994 and 1995, respectively, Mr. Routon earned $109,470 and $145,028 from ALD, and Mrs. Routon earned teaching salaries of $41,751 and $43,575.

In 1985, petitioners established Ascension Arabians (Ascension), a horse breeding operation.  Petitioners believed Ascension would provide substantial income in their retirement years.  They maintained their full-time jobs, began devoting 35

---

[1](...continued)
all Rule references are to the Tax Court Rules of Practice and Procedure.

hours a week to Ascension's activities, and regularly consulted with Arabian horse experts relating to Ascension's operations.

Mr. Routon kept Ascension's books and records, purchased insurance, attended seminars, and occasionally showed the horses at expositions and competitions. He immersed himself in the Arabian horse industry, taking various leadership positions in trade organizations and writing columns for industry magazines. Mrs. Routon searched for suitable horse breeding and farming properties and tended to the horses when Mr. Routon was unavailable. Ascension's horses were handled by a professional trainer. Expenses relating to Ascension and ALD were billed to, and paid out of, the same account. At the end of each year, Mr. Routon would summarize the expenses relating to both businesses. Mr. Routon promoted Ascension by conducting seminars; mailing video tapes featuring their top stallion, Diamond Bask, to seminar attendees; advertising in trade magazines; and attending exhibitions.

Petitioners' horses have substantial value. Diamond Bask, their top stallion, is worth $250,000. Despite the quality of their horses, petitioners' sales and marketing endeavors were ineffective. From 1988 through the years in issue, Ascension's cumulative income and expenses were $15,575 and $531,964, respectively. During this period, petitioners did not have a profitable year but made several operational adjustments to

improve their chances of turning a profit (i.e., selling inferior horse stock in 1989, reinvesting the horse sale proceeds in national quality stock, investigating and implementing the use of frozen semen, etc.). During the years in issue, petitioners' prospective horse sales failed because of injury to a horse and misrepresentations made to petitioners.

Petitioners' tax returns for 1994 and 1995 were prepared by an enrolled agent, James G. Joelson, who acquiesced to the tax treatment of their horse activity. Petitioners' 1994 return was filed on October 30, 1995. Respondent disallowed all of petitioners' expenses relating to Ascension for 1994 and 1995, contending that their horse activity was not engaged in for profit.

OPINION

I.   Profit Objective

Section 183 limits the deductions for an activity not engaged in for profit. Sec. 183(b). This case is appealable to the Ninth Circuit Court of Appeals. The primary purpose standard has been followed by that circuit in determining whether the requisite profit objective exists. See Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), affg. T.C. Memo. 1991-212 (holding that profit must be the predominant, primary, or principal objective). Petitioners bear the burden of proving the requisite

profit motive.[2]  Skeen v. Commissioner, 864 F.2d 93, 94 (9th Cir. 1989).

To determine whether petitioners conducted their activity for profit, we must weigh all facts and circumstances.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981).  Section 1.183-2(b), Income Tax Regs., sets forth a nonexclusive list of nine factors to guide courts in analyzing a taxpayer's profit objective.  See Elliott v. Commissioner, 90 T.C. 960 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990).  The nine factors are:  (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved in the activity.  Sec. 1.183-2(b), Income Tax Regs.  Upon review of these factors, we conclude that section 183 does not limit

---

[2]Sec. 7491 is not applicable to this case.

petitioners' deductions because petitioners engaged in their horse breeding activity to make a profit.

### A. Businesslike Manner

Petitioners invested significantly in advertising and promotions, attended expositions, used professional trainers, purchased insurance, and kept records in the same manner Mr. Routon has for his successful business ventures. Further, they abandoned unprofitable methods in a manner consistent with an intent to improve profitability. See sec. 1.183-2(b)(1), Income Tax Regs.

### B. Expertise

Mr. Routon consulted extensively with Arabian horse industry experts. He also had previous experience with farming and animals before establishing Ascension and has since immersed himself in the Arabian horse industry. In addition, Mr. Routon has significant business experience from his other ventures.

### C. Time Devoted to the Activity

Respondent does not contest the fact that petitioners handled virtually all material aspects of Ascension. In addition to their full-time engagements, petitioners devoted substantial time and energy caring for and maintaining Ascension's horses.

### D. Expectation That Assets May Appreciate

Assets related to Ascension have appreciated and, in accordance with petitioners' plan, may further appreciate.

Petitioners' uncontradicted expert testimony is that petitioners' horses and land are worth approximately $2 million.

### E. Taxpayers' Financial Status

Petitioners had modest resources yet consistently invested nearly half their annual income in Ascension because they sincerely believed that they would eventually turn a profit. Petitioners were shrewd, hardworking, diligent, and levelheaded. We do not believe that they would squander their hard-earned money on an extravagant hobby.

### F. Amount of Profits

Although Ascension produced only losses, the opportunity to earn substantial profits in a highly speculative venture is sufficient to indicate that the activity is engaged in for profit. Sec. 1.183-2(b)(7), Income Tax Regs. For example, "it may be found that an investor in a wildcat oil well who incurs very substantial expenditures is in the venture for profit even though the expectation of a profit might be considered unreasonable." Sec. 1.183-2(a), Income Tax Regs.

Petitioners were simply poor marketers who lacked the requisite reputation in the industry, but they had quality horses and a venture that could be profitable if they changed their business practices. For example, petitioners' expert witnesses indicated that syndication of one of Diamond Bask's offspring, Diamonds N Jazz, would be quite profitable.

G.    History of Income and Losses

Entrants in the horse industry may incur substantial losses during a lengthy startup stage.  See Engdahl v. Commissioner, 72 T.C. 659, 669 (1979).  Such losses are not necessarily an indication that the activity was not engaged in for profit.  See sec. 1.183-2(b)(6), Income Tax Regs.  Petitioners believed that their losses would be recouped by the breeding, and sale, of one or more preeminent stallions and that Ascension would provide an income stream during their retirement years.  See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965) (stating that there is an overall profit if net earnings and appreciation are enough to recoup losses sustained in prior years), affd. 379 F.2d 252 (2d Cir. 1967).

H.    Personal Pleasure or Recreation

Petitioners did not ride Ascension's horses for pleasure, nor did they typically travel with the horses to exhibitions and competitions.  While petitioners thoroughly enjoy their work, a business will not be turned into a hobby merely because the owner finds it pleasurable.  See Jackson v. Commissioner, 59 T.C. 312, 317 (1972).

I.    Success in Similar or Dissimilar Activities

Prior to establishing Ascension, Mr. Routon created two successful business ventures for which he had limited expertise at the outset, a newspaper distributorship and a leak detection

business.  Petitioners established that they are just as determined to earn a profit with Ascension.

II.  <u>Section 6651 Addition to Tax</u>

Section 6651(a)(1) imposes an addition to tax for failure to file a required return on the date prescribed, unless it is shown that such failure is due to reasonable cause and not willful neglect.  Petitioners have not shown that such failure to file by the prescribed date was due to reasonable cause and not willful neglect.  Accordingly, petitioners are liable for the 1994 addition to tax.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.