T.C. Memo. 2021-107

UNITED STATES TAX COURT

GAYLE GASTON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25899-17.                                Filed September 2, 2021.

<u>Joseph A. Broyles</u>, for petitioner.

<u>Michael K. Park</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined income tax deficiencies of $59,872 and $57,717 for petitioner's tax years 2013 and 2014, respectively, and an addition to tax under section 6651(a)(2) and a penalty under section 6662 for each

[*2] year.[1]  After concessions,[2] the issues for decision are:  (1) whether petitioner

engaged in acting as a trade or business in the tax years at issue and, if so, whether

petitioner is entitled to deduct any reported expenses relating to that trade or

business, (2) whether petitioner engaged in jewelry sales as a trade or business in

the tax years at issue and, if so, whether petitioner is entitled to deduct any claimed

flowthrough losses relating to that trade or business, and (3) whether petitioner is

entitled to deduct contributions to an alleged qualified profit-sharing plan for the

tax years at issue.

## FINDINGS OF FACT

Petitioner is a former national sales director for the Mary Kay, Inc (Mary

Kay).  She began working for Mary Kay in 1967 and reached the position of

national sales director (NSD) in 1974.  As an NSD, petitioner was entitled to

participate in Mary Kay's deferred compensation program known as the Family

---

[1]All section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.  Some monetary amounts have been rounded to the nearest dollar.

[2]Respondent has conceded the sec. 6651(a)(2) additions to tax and that he cannot meet his burden of production under sec. 6751(b) with regard to the sec. 6662 penalties.  Petitioner has conceded that she is not entitled to deductions claimed on Schedule C, Profit or Loss From Business, for business use of her home or for any deduction to which the sec. 274(d) strict substantiation requirements apply.

[*3] Security Program (FSP), which she joined in September 1991. The FSP imposed a mandatory retirement age of 65 and provided that, upon her retirement, petitioner would be paid a monthly distribution scaled to a percentage of the average of her three highest commission years during the five years before retirement.[3]

In 2008, two years before she reached the mandatory retirement age, petitioner established the Gayle Gaston Sole Proprietor Profit Sharing Plan (plan). The plan was drafted by Dennis Mehringer and defined the term "plan sponsor" to mean "Gayle Gaston". The plan does not identify a specific line of business to which the plan relates, and Mr. Mehringer testified that the plan was not created with respect to any particular trade or business of petitioner. The plan went into effect on January 1, 2008, for "Gayle Gaston, a California Sole Proprietorship (the 'Plan Sponsor')".

In 2010 petitioner retired from Mary Kay, having reached the FSP's mandatory retirement age. In her career with Mary Kay petitioner was highly successful; accordingly, her annual distributions under the FSP were $518,779 and $513,284 for 2013 and 2014, respectively.

---

[3]For more details on the operation of the FSP, which are not determinative of this case, see Peterson v. Commissioner, 827 F.3d 968, 970-980 (11th Cir. 2016), aff'g in part, dismissing in part T.C. Memo. 2013-271.

**[*4]** After her retirement from Mary Kay, petitioner took up a number of non-Mary Kay activities. First, through a wholly owned S corporation, Gayle Gaston, Inc., petitioner began to sell jewelry to her former Mary Kay associates. This activity remained small, with petitioner devoting little more than 10 hours per week to its progress. After the Mary Kay organization prohibited former national sales directors from selling to the Mary Kay cosmetics sales force, petitioner attempted to sell her jewelry to the general public but spent very little time or effort doing so, and she ceased her jewelry sales activity shortly thereafter. Petitioner's jewelry sales activity generated losses in each year at issue. Second, petitioner also explored whether she could begin a hair care products venture that would manufacture certain hair care products in Peru and then import them to the United States for sale. Petitioner did not produce a product for sale, never moving beyond the stage of designing her requirements for a future product. With the exception of two trips in 2013 and 2014 to Lima, Peru, which also included personal leisure, petitioner devoted only a few hours per week to this activity.[4]

---

[4]Petitioner did not address her hair care activity in her opening brief; consequently, we deem petitioner to have waived any argument with respect to the activity. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003). Moreover, even if the hair care activity were still at issue, the record regarding this activity is devoid of any credible evidence that the activity ever went beyond the preliminary planning stage or evolved into a business for profit.

**[*5]**    In addition to these two activities petitioner also decided to start acting. Petitioner had a prior history in the entertainment business, having engaged in some production activity in the 1980s. Petitioner also has family connections to the entertainment industry: Her son was an actor in Japan and later a cinematographer, and her daughter is (and was during the years at issue) one of the most successful actresses in Hollywood.

To further her acting activity petitioner retained an assistant, Josline Giragossian, who helped her identify casting opportunities and manage her applications. Petitioner also engaged various casting services, retained an agent and a business management company, secured professional headshots, advertised her skills, and took acting and voice lessons. Petitioner devoted significant time to this activity. Between the preparatory work, securing auditions, and acting in roles she secured, petitioner personally spent at least 40 hours per week on her acting activity. Petitioner worked hard at this activity, but she also enjoyed acting. Although petitioner did not generate a profit from the acting activity in the years at issue or in subsequent years, by 2011 she had secured her first film credit. In 2013 petitioner performed in at least one feature-length film. By 2019 petitioner had secured at least 10 film credits and various other roles in commercials.

**[*6]** Upon receiving her distributions from the FSP in 2013 and 2014, petitioner contributed $51,000 from each year's distribution to the retirement plan she had established in 2008. On each of her 2013 and 2014 income tax returns, petitioner reported the distribution from the FSP as income from a sole proprietorship on a Schedule C and claimed a deduction for the contribution to her retirement plan. On each Schedule C petitioner also claimed deductions for numerous expenses relating to her acting activity. Additionally, in each year petitioner claimed passthrough loss deductions from her S corporation on Schedules E, Supplemental Income and Loss, which were generated by her jewelry sales activity.

Petitioner's 2013 and 2014 returns were selected for examination. On September 12, 2017, respondent issued a notice of deficiency that disallowed petitioner's claimed acting activity expense deductions, her claimed passthrough loss deductions from her jewelry activity, and her claimed deductions for retirement contributions and determined income tax deficiencies, additions to tax, and penalties for petitioner's tax years 2013 and 2014. On December 12, 2017, petitioner, while residing in California, timely petitioned this Court for redetermination of the deficiencies, additions to tax, and penalties.

[*7]                                    OPINION

I.      Petitioner's Acting Activity

Petitioner reported $83,041 and $98,818 in Schedule C expenses on her 2013 and 2014 returns, respectively.  Petitioner contends that these expenses relate to her acting career and are ordinary and necessary business expenses within the meaning of section 162.  Respondent disallowed deductions for these expenses on the basis that petitioner cannot show that she engaged in her acting activity to make a profit.  Petitioner does not allege, nor has she proven, that the burden of proof should shift to respondent pursuant to section 7491(a), and petitioner bears the burden of proof as to all issues remaining in dispute.  See Rule 142(a).

Whether a taxpayer may deduct an expense of an activity as an ordinary and necessary business expense turns on whether:  (1) the taxpayer can establish that she engaged in the activity as a trade or business; i.e., the taxpayer engaged in the activity with the "predominant, primary or principal objective" of making a profit, Wolf v. Commissioner, 4 F.3d 709, 713 (9th Cir. 1993), aff'g T.C. Memo. 1991-212, and (2) the taxpayer can substantiate the reported expense as an ordinary and necessary business expense, see sec. 183; Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); see also sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  Respondent has conceded

**[*8]** that petitioner actually paid the reported expenses. We therefore must determine only whether the expenses petitioner paid were ordinary and necessary expenses of a business activity in which she engaged with the predominant, primary, or principal objective of making a profit.

A.    Petitioner Intended To Profit From Her Acting Activity.

In determining whether a taxpayer engaged in an activity with "the predominant, primary or principal objective" of making a profit, we consider all the facts and circumstances. See Wolf v. Commissioner, 4 F.3d at 713; see also sec. 1.183-2(b), Income Tax Regs. We pay particular attention to the factors set out in section 1.183-2(a) and (b), Income Tax Regs.: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the taxpayer's time and effort expended in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the taxpayer's success in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the presence of personal pleasure or recreation. No one factor is controlling, and we consider the totality of the facts, giving greater weight to the objective evidence than to the taxpayer's statements of intent. Overall, however,

**[*9]** the critical question is the presence or absence of the taxpayer's intent to profit from the activity, not necessarily the taxpayer's actual success in that regard. An objectively "reasonable expectation of profit is not required". Dreicer v. Commissioner, 78 T.C. at 645. We require only that the taxpayer engage in the activity with the primary purpose of making a profit. Wolf v. Commissioner, 4 F.3d at 713.

Petitioner argues that she was engaged in the business of acting in commercials and films. In support of her claim that she engaged in this activity for profit, petitioner testified that she decided to take up acting to help supplement her income after retiring from Mary Kay. Specifically, because her FSP payment would be less than her compensation while actively working for Mary Kay, she wanted to have an acting career to fill the gap between her pre- and post-retirement income. Petitioner alleges that she approached the development of her career in a businesslike way by retaining an assistant and a casting agency to help her identify and apply for auditions for roles. Finally, petitioner asserts that, while she did not generate significant revenue during the tax years at issue, in more recent years she has secured several film roles on the basis of her early efforts to establish herself during the years at issue.

[*10] Acting is a difficult career, with a high risk of failure but a rare and lucrative possibility of success. In our prior opinions discussing the profession we have noted that the industry is "highly speculative", "high risk", and "arduous". Green v. Commissioner, T.C. Memo. 1989-599, 58 T.C.M. (CCH) 606, 608 (1989); Isenberg v. Commissioner, T.C. Memo. 1987-269, 53 T.C.M. (CCH) 946, 955 (1987); Vandenhoff v. Commissioner, T.C. Memo. 1987-116, 53 T.C.M. (CCH) 271, 277 (1987). This industry often requires its participants to maintain a passion for the work because, without such a passion, a taxpayer likely "would not devote * * * [the necessary] time to its pursuit." Green v. Commissioner, 58 T.C.M. (CCH) at 608. Accordingly, that an individual enjoys acting will not foreclose a finding that the taxpayer also intended to profit from it. See id. ("[S]uffering has never been made a prerequisite to deductibility." (quoting Jackson v. Commissioner, 59 T.C. 312, 317 (1972))). When analyzing whether particular taxpayers have proven that they entered into acting activities with an intent to profit, we have considered such industry-specific factors as whether they: (1) belong to an acting network or union, (2) take classes or otherwise formally develop their skills, (3) develop industry contacts, (4) seek or secure multiple auditions or roles, (5) advertise their services, (6) prepare headshots or a portfolio, (7) retain an agency or assistant to help secure roles, and (8) maintain their efforts

[*11] over time, given the nature of the industry.  See Richards v. Commissioner, T.C. Memo. 1999-163, 77 T.C.M. (CCH) 2006, 2013 (1999); Green v. Commissioner, 58 T.C.M. (CCH) at 608; Regan v. Commissioner, T.C. Memo. 1979-340, 38 T.C.M. (CCH) 1330, 1332-1333 (1979).

In the light of these factors and those listed in section 1.183-2(b), Income Tax Regs., we conclude that petitioner intended to profit from her acting activity and that her intent to make a profit from acting was her principal objective.  To start, petitioner secured roles in feature-length films, including one during the years at issue.  She testified credibly that she spent approximately 35 to 45 hours per week researching, applying, and auditioning for roles.  She studied and trained to enhance her skills through acting and voice lessons, evincing her desire to increase her marketability.  She also maintained subscriptions to various casting services, whereby her portfolio and headshots would be presented to industry casting directors.  To assist her in securing roles, she retained an assistant and an agent to research and submit her materials for opportunities to audition.  Taken together, these actions indicate that petitioner carried on her affairs in a businesslike manner, with substantial investment of time and effort, and that her activities in the years at issue increased her acting opportunities in later years.

[*12] Respondent's arguments to the contrary are unconvincing. Respondent argues that if petitioner truly had a profit motive she could have secured far more bookings than she did simply by consulting with her daughter, one of the most successful actresses in Hollywood. Moreover, respondent contends that because her daughter is a successful actress, petitioner gained substantial enjoyment from working in the same industry and therefore could not have had a bona fide intent to make a profit. Finally, respondent notes that petitioner has never generated a profit from her acting activity, and so, respondent contends, she could not have engaged in the activity with an intent to profit.

We see no reason to require petitioner to bootstrap her daughter's successes to secure her own. While consulting with experts in a given industry is one indication of a profit motive, see sec. 1.183-2(b)(2), Income Tax Regs., petitioner's desire to not involve her daughter in her career is understandable. Moreover, petitioner separately retained an agency to assist her in securing roles. Although it may be true that petitioner enjoyed acting and that she enjoyed working in the same industry as her daughter, we do not agree that this requires a finding that petitioner did not also intend to profit from her work. See Jackson v. Commissioner, 59 T.C. at 317 ("Success in business is largely obtained by

**[\*13]** pleasurable interest therein." (quoting <u>Wilson v. Eisner</u>, 282 F. 38, 42 (2d Cir. 1922))).

Finally, it is true that petitioner's acting activity did not generate a profit during the years at issue or in later years. The acting activity generated a loss for each year that petitioner used to offset substantial income for each year at issue and for later years. While a history of losses is one factor that we consider in determining whether the taxpayer had the principal objective of making a profit from an activity, the presence or absence of profits is not determinative. Petitioner need only show that making a profit from her acting activity was her principal objective in conducting that activity, and on this record, after considering all of the relevant factors, we conclude that she has done so and thus was engaged in the trade or business of acting during the years in issue.

B.  <u>Petitioner Has Not Substantiated All Reported Acting Activity Expenses</u>.

We now turn to an analysis of whether petitioner has substantiated her reported expenses. Although we have found that petitioner engaged in her acting activity during the years at issue primarily to make a profit, her acting activity does not entitle her to deduct every expense she paid in the ordinary course of a work day.

**[*14]** Deductions are a matter of legislative grace and a taxpayer must provide adequate substantiation to prove entitlement to a deduction for a particular expense. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Section 162(a) permits a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". A taxpayer is required to maintain records sufficient to substantiate the items underlying the deductions claimed on the taxpayer's return. See sec. 6001. If a taxpayer proves that she is entitled to some deduction but cannot substantiate the full amount claimed, generally the Court may estimate the amount of the allowable expense deduction to the best of its ability, "bearing heavily * * * upon the taxpayer whose inexactitude is of * * * [her] own making." Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930) (Cohan rule). For the Court to estimate the amount of an expense, there must be a reasonable basis in the record to support that estimate. Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985).

The Cohan rule, however, does not apply to certain expenses delineated in section 274(d). See sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). For those expenses (e.g., expenses relating to travel, meals and entertainment, gifts, or other "listed property" as defined in section 280F(d)(4)), a taxpayer must meet the strict substantiation requirements set out in

[*15] section 274. To satisfy the strict substantiation requirements, a taxpayer must introduce sufficient evidence to corroborate (1) the amount of the expense or other item; (2) the time and place of travel, entertainment, or use of the property; (3) the business purpose of the expense or other item; and (4) the business relationship of the taxpayer to the persons entertained or using the property. See sec. 274(d). With respect to the use of listed property, the taxpayer must establish the amount of business use and the amount of total use. Sec. 1.274-5T(b)(6)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985).

Respondent has conceded that petitioner actually paid most of the expenses reported on her Schedule C for both tax years. Respondent disputes, however, that petitioner has proven that any of the reported expenses were ordinary and necessary expenses relating to her acting business. In her posttrial brief, petitioner conceded that she cannot meet the strict substantiation requirements imposed by section 274 as they apply to any relevant reported expense. We therefore must examine the record to see whether petitioner has proved she is entitled to deduct any reported expense not subject to section 274, bearing in mind the Cohan rule.

Petitioner claimed deductions for myriad expenses, including some that appear inherently connected with a career in acting and others that, absent specific proof, appear to be nondeductible personal expenses. For the sake of brevity, as to

**[*16]** any reported expense that is not discussed specifically below, we conclude that petitioner has failed to carry her burden of proving that the expense was an ordinary and necessary expense of her acting activity business.

i.      Expenses Inherently Connected With Acting

As just noted, petitioner has reported some expenses that on their face appear inherently connected with her acting activity.

One type of expense in this category is photography. Headshots and various other photography projects are a necessary element of any actor's portfolio, and we have recognized that such expenses are indicative of an intent to profit from acting. See Richards v. Commissioner, 77 T.C.M. (CCH) at 2014 ("Expenses for * * * agent fees, photo session[s], and duplicate photos are all ordinary and necessary expenses of an actress-model activity."). Respondent disallowed petitioner's reported photography expenses on the basis that she was not engaged in a trade or business. Because we found that she was engaged in the business of acting, we further conclude that the reported photography expenses were inherently connected with that business. Accordingly, we allow the reported photography expense deductions.[5]

---

[5]Specifically, these are as follows: for tax year 2013, $140 paid to Better Photos, $153 to Hollywood Retouching, and $250 to an unidentified photographer

(continued...)

**[*17]** Similarly, we have concluded that fees paid to a casting agency are ordinary and necessary expenses for an actor. Id. For the same reasons just stated with respect to the photography expenses, we conclude that the amounts petitioner paid to retain a casting agency are inherently connected with her acting activity. Accordingly, we allow those amounts.[6]

Finally, another expense we have found to be ordinary and necessary for an actor is the cost of enhancing the individual's acting skills. See Green v. Commissioner 58 T.C.M. (CCH) at 608 ("[The taxpayer] continually hones and refines his skills."). Petitioner retained the services of two individuals, John Deaver and Linda Valentino, to give her voice and dance lessons, and paid them $1,150 and $350, respectively, during 2013. We conclude that petitioner took these classes to enhance her range as an actor, and accordingly, we allow deductions for these amounts.

---

[5](...continued)
stipulated by the parties; and for tax year 2014, $292 to Sammy's Camera.

[6]Specifically, we allow petitioner's reported expense of $1,678 paid to casting agencies for 2013.

[*18]    ii.    Other Expenses

a.    Assistant Expenses

Petitioner reported expenses of $28,219 and $29,565 on her Schedules C as compensation to her personal assistant, Ms. Giragossian, for tax years 2013 and 2014, respectively.  The parties have stipulated these amounts and that they were in fact paid to Ms. Giragossian.  As with the other expenses reported on petitioner's Schedules C, respondent disallowed deductions for these amounts on the basis that she was not engaged in a trade or business.

Because we have rejected respondent's argument that petitioner was not engaged in a trade or business, we turn to petitioner's contention that the full amounts paid to Ms. Giragossian are ordinary and necessary business expenses.  While we accept the parties' stipulation as to the fact and amounts of payments to Ms. Giragossian, this is not enough--on its own--to entitle petitioner to a deduction for the entirety of each of those amounts.  Petitioner must also prove the connection with her acting activity.

At trial petitioner credibly testified that Ms. Giragossian assisted her with her acting business during the years at issue.  But petitioner also credibly testified that Ms. Giragossian assisted her with her jewelry sales activity and the potential hair care venture.  As discussed below, we conclude that neither of those activities

[*19] was a trade or business. Accordingly, the time Ms. Giragossian spent on those matters was spent on petitioner's personal hobbies, and we must reasonably account for the time spent on nondeductible personal activities. Consequently, we cannot and do not allow petitioner to deduct the full amount paid to Ms. Giragossian for either year as a business expense relating to her acting activity.

Rather, because we believe that petitioner is entitled to some deduction for the amounts paid to her assistant, we apply the Cohan rule to approximate, as best we can with an eye toward petitioner's own inexactitude, the appropriate deduction for each year. We find petitioner's testimony regarding Ms. Giragossian's activities credible. We also find petitioner's testimony regarding the number of hours she spent each week on her acting business and other various activities to be credible. We therefore conclude that we have a reasonable basis to make a Cohan rule approximation because that testimony provided a discernible--if imprecise--allocation of Ms. Giragossian's activities. See Vanicek v. Commissioner, 85 T.C. at 742-743. Specifically, petitioner spent roughly 40 hours per week on her acting business, as well as 10 hours on her jewelry sales activity and fewer on her hair care products activity. We think it is reasonable to infer that her assistant's time allocation tracked petitioner's own, with time spent on actions relating to

[*20] petitioner's acting business representing approximately 75% of her work.[7]

Accordingly, we find it reasonable to allocate the compensation proportionately.

We therefore allow as a deduction 75% of the compensation claimed for each year,

and we disallow 25%.

b.    Professional Service Expenses

Petitioner reported professional service expenses relating to her acting

business for each year at issue. Specifically, for tax year 2013 petitioner reported

$440 in legal expenses, $235 in accounting expenses, and $1,325 in fees to a

business management company, and for tax year 2014 she reported $420 in legal

expenses and $9,645 in fees to a business management company. Respondent

disallowed deductions for all reported expenses. We conclude that some, but not

all, of the reported professional services expenses are connected with petitioner's

acting activity, and therefore are properly deductible.

As with the reported assistant expenses, petitioner argues that the mere fact

that she engaged in acting as a business requires that all these reported expenses

are properly deductible. Yet, petitioner must also prove the connection between

---

[7]To reach this number, we credit petitioner with working 40 hours per week on her acting business, 10 hours per week on her jewelry sales activity, and 3 hours per week on her hair care products activity. Reduced to a fraction, her acting business therefore represented 75.47% of her total activities.

**[*21]** the amounts paid and her acting business. As with the assistant expenses, we agree that petitioner ran an acting business and paid some amounts of administrative and professional expenses that are typical of any business. Accordingly, we again turn to the Cohan rule.

We start with her reported legal expenses. Petitioner testified that these expenses were paid for the drafting of management contracts and to collect on a loan she issued to an individual to produce a film project. Petitioner further testified that the management contracts were related to the management of a singer but offered little detail regarding petitioner's alleged management activities. While these expenses appear to be tangential to her acting business, there is insufficient evidence in the record to firmly establish a connection between these expenses and her acting business. Accordingly, we sustain respondent's disallowance of these deductions.

We next address the accounting expenses that petitioner deducted on her 2013 Schedule C. Petitioner testified that the expenses related to "a black operative investigation" against her and that she paid the disputed amount to have a consultant examine her computer. While we appreciate that the world of espionage has provided fruitful ground for generations of actors and film makers, we fail to see how the reported expense is connected with petitioner's acting

[*22] business. Accordingly, we sustain respondent's disallowance of these expense deductions.

By contrast, there is sufficient evidence in the record to conclude that some portion of petitioner's expenses relating to her business management company was connected to her acting business. Petitioner credibly testified that these expenses were paid to a company that paid her business' bills, handled its bookkeeping, assisted in preparation of her tax returns, and other administrative expenses that ordinarily arise in the course of any business. Moreover, petitioner's business manager also testified at trial about the nature and scope of her work, confirming petitioner's own testimony. Specifically, her business manager credibly testified that she helped manage expenses and accounting for three types of activities: petitioner's acting business, her jewelry sales activity, and her hair care products activity. Just as we allocated the amounts paid to petitioner's assistant, we conclude that the amounts paid to petitioner's business manager should also be allocated among the three activities in proportion to the time that petitioner and her business manager presumably spent on them. Accordingly, we allocate the amounts paid to petitioner's business management company, Klein Mendelblatt, in the same proportion, allowing 75% of the reported expense deductions and disallowing the remaining 25%.

[*23] II.    Petitioner's Jewelry Sales Activity

In contrast to her acting activities petitioner has not proven that she engaged in her jewelry sales activity for profit.  Accordingly, we sustain respondent's determination disallowing the passthrough loss deductions from those activities claimed on petitioner's 2013 and 2014 Schedules E.

Petitioner deducted the expenses of her jewelry sales activity on S corporation returns for 2013 and 2014 and claimed the resulting loss deductions on Schedules E of her individual income tax returns.  Although section 183 applies at the corporate level with respect to the activities of an S corporation, sec. 1.183-1(f), Income Tax Regs., we examine the intent of petitioner, the S corporation's sole shareholder, in deciding whether the S corporation had the requisite profit objective, see, e.g., Baldwin v. Commissioner, T.C. Memo. 2002-162, 83 T.C.M. (CCH) 1915, 1926-1927 (2002).

As noted above, in analyzing whether a taxpayer engages in an activity for profit we consider the totality of the circumstances surrounding that activity, with particular regard for the factors set forth in section 1.183-2(b), Income Tax Regs. The record does not indicate that petitioner carried on her jewelry sales activity in a businesslike manner or did anything meaningful to elevate this activity to a business capable of generating a profit.  Rather, the record indicates that

[*24] petitioner's jewelry sales activity was a haphazard, intermittent affair. Petitioner testified that she spent only 10 hours per week on the activity. This is in stark contrast to her testimony regarding the time she spent on her acting business, which commanded 35 to 45 hours per week. Moreover, there is no indication that petitioner sought out expertise in the jewelry industry. Finally, we find it of particular note that even the intermittent sales petitioner made were to former associates from her Mary Kay career. Petitioner did not make a sustained effort to sell to the general public outside this network and ceased her jewelry sales activity when she could no longer sell to her former Mary Kay associates. On this record, we conclude that petitioner did not operate her jewelry sales activity with the primary purpose of making a profit. Accordingly, we sustain respondent's determination disallowing the passthrough loss deductions from the jewelry sales activity that petitioner claimed on her Schedules E.

III. Retirement Contributions

Petitioner claimed deductions of $51,000 for each year at issue for contributions made to her purported retirement plan from the FSP payments she received. Respondent disallowed the claimed deductions on the basis that petitioner was retired and not engaged in any trade or business, Mary Kay-related or otherwise. Respondent further contends that no deduction is allowed because

**[*25]** petitioner had no "earned income" within the meaning of section 401(c)(2)(A).

Petitioner concedes that the revenues reported on her Schedules C as income from her trade or business actually represented payments from the Mary Kay FSP. Petitioner, accordingly, acknowledges that these revenues do not relate to the expenses reported on the Schedules C for petitioner's acting business. Petitioner contends, however, that these revenues are not merely retirement income that should have been reported as such. Rather, petitioner contends that these payments represented self-employment income subject to self-employment taxes. In support, petitioner cites our opinion in <u>Peterson v. Commissioner</u>, T.C. Memo. 2013-271, <u>aff'd in part, dismissed in part</u>, 827 F.3d 968 (11th Cir. 2016), where this Court held that FSP payments to a Mary Kay NSD were subject to self-employment taxes because they were self-employment income within the meaning of section 1402(a) and (b). Building on this holding, petitioner argues that because this Court has held that FSP payments are taxable self-employment income within the meaning of section 1402(a) and (b), they must also be "earned income" within the meaning of sections 401(c)(2)(A) and 404(a)(8)(B). As a result, petitioner argues, the contributions she made from the FSP payments to her profit-sharing plan are deductible under sections 401 and 404.

[*26] Section 404(a) allows an employer to deduct certain contributions to deferred compensation plans that are paid or accrued on account of an employee. With respect to self-employed individuals, section 404(a)(8)(C) provides that contributions to a plan are deductible "to the extent that such contributions do not exceed the earned income of such individual * * * derived from the trade or business with respect to which such plan is established". Section 404(a)(8)(B) provides that "earned income" has the meaning assigned by section 401(c)(2), which, in turn, provides that "earned income" means the net earnings from self-employment as defined by section 1402. However, for purposes of section 401(c), such net earnings are determined only with respect to a trade or business in which the personal services of the taxpayer are a material income-producing factor. Sec. 401(c)(2)(A)(i).

Petitioner's argument rests on the premise that, because FSP payments are subject to self-employment taxes under section 1402, they must also qualify as "earned income" within the meaning of sections 401 and 404. Although petitioner relies on Peterson v. Commissioner, T.C. Memo. 2013-271, for the proposition that her FSP payments were earned income subject to self-employment under section 1402, petitioner acknowledges on brief that "the Peterson case did not reach the question presented in this case": whether FSP payments may be used to fund

[*27] deductible contributions under sections 401 and 404 to a qualified retirement plan. Respondent's argument is that because petitioner, in his view, was not engaged in any trade or business in the years at issue, there is no employer entitled to make contributions under section 401. Additionally, respondent contends that petitioner's FSP payments are not "earned income" within the meaning of section 401(c)(2) because petitioner did not render any personal services to Mary Kay in the years at issue, even though personal services she rendered in prior years are undoubtedly a material income-producing factor.

Whether petitioner's FSP payments are "earned income" within the meaning of sections 401 and 404 is only the second of two hurdles presented by section 404(a)(8)(C) that petitioner must clear in order for her contributions to the plan to be deductible. The first is that contributions are deductible only to the extent that they do not exceed the "earned income * * * derived from the trade or business with respect to which * * * [the] plan is established". Sec. 404(a)(8)(C) (emphasis added). Petitioner has not shown that the plan was established with respect to her Mary Kay business, which is the undisputed source of the income at issue. The plan document does not identify to which trade or business petitioner's plan relates, and Mr. Mehringer credibly testified that the plan was not created with respect to any specific trade or business. Whether petitioner's FSP income is

**[*28]** "earned income" within the meaning of sections 401 and 404 is a question we need not reach because petitioner has not proven that the plan was established with respect to her former Mary Kay activity.

We conclude that petitioner may not deduct the contributions that she made to her allegedly qualified plan because she has not proven that the income contributed was derived from a trade or business with respect to which the plan was established. The only trade or business in which P engaged in during the years at issue was acting, which generated no taxable income. We therefore sustain respondent's disallowance of her claimed retirement contribution deductions.

Decision will be entered under

Rule 155.