# United States Tax Court

T.C. Memo. 2023-128

WOLFGANG FREDERICK KRASKE,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 27574-15.　　　　　　　　　　　Filed October 26, 2023.

————

Wolfgang Frederick Kraske, pro se.

*Alexander D. DeVitis* and *Christine A. Fukushima*, for respondent.

## MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, *Judge*:  Respondent determined the following deficiencies and accuracy-related penalties with respect to petitioner's federal income tax for taxable years 2011 and 2012:

| Year | Deficiency | Penalty § 6662(a)[1] |
|------|-----------|----------------------|
| 2011 | $11,464 | $2,293 |
| 2012 | 11,403 | 2,281 |

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round all monetary amounts to the nearest dollar.

[*2]   We consider the penalties in a separate opinion also filed today, *Kraske v. Commissioner*, No. 27574-15, 161 T.C. (Oct. 26, 2023).  The other issues for decision are (1) whether petitioner engaged in a business activity with the objective of making a profit within the meaning of section 183; (2) whether petitioner incurred startup expenses that were required to be capitalized under section 195; and (3) whether petitioner is entitled to deduct home office expenses of $12,840 for each taxable year 2011 and 2012.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The First Stipulation of Facts, First Supplemental Stipulation of Facts, and the attached Exhibits are incorporated herein by this reference.  Petitioner resided in California when he timely filed his Petition.

I.   *Petitioner's Education and IT Career*

Petitioner is an internet technology (IT) professional with a Ph.D. in electrical engineering from the University of Southern California (USC).  During the years at issue petitioner was employed by SRA OSS, Inc. (SRA OSS), a Japanese consulting company with an office in San Jose, California, and received income reported on Forms W–2, Wage and Tax Statement.  Per petitioner's timesheets, he worked over 50 hours per week for SRA OSS, on average.  SRA OSS contracted with third parties for the provision of petitioner's services as a cloud computing engineer.  SRA OSS did not provide office space for petitioner at its San Jose location.  Before his work with SRA OSS, petitioner worked at e-commerce and telecommunications companies.

II.   *Petitioner's Schedule C Activity*

In addition to working for SRA OSS during the years at issue, petitioner purportedly conducted an activity that he reported as a business activity on Schedules C, Profit or Loss From Business.  Petitioner conducted this activity before, during, and after the years at issue and at various times referred to it as either RoboSphere or as

[*3] Ovium.[2]     As petitioner used the terms interchangeably, for simplicity we will hereinafter refer to the activity as Ovium.[3]

Petitioner started Ovium in 2004.  Before the years at issue, petitioner created a "Strategic Business Plan" and "Business Overview" for Ovium.  The Strategic Business Plan describes Ovium as effecting a shift from silicone-based computing to carbon-based computing.  As part of this model, Ovium planned three generations of 36-month product development plans, with the first culminating in creating and manufacturing nanocomputers, the second culminating in nanorobots, and the third culminating in a bacterial computer.  The Strategic Business Plan described Ovium as focused on developing "self organizing nanocomponents," a "quantum computer," and "communities of protein 'nanorobots'" for the "construction and maintenance of the nanocomputer."

To capitalize on this development, Ovium planned to have five product lines: nanocomputers, proteomics, genomics, quantum computing, and a "Community Agent Programming and Operating System."  The nanocomputer products would include supercomputer systems, quantum computer processing, quantum computers contained within bacterial cells that could function as sensor arrays, and nanotube "holographic immersion" virtual reality displays.  As part of the nanocomputer breakthroughs, Ovium projected developments in "quantum phenomenon, such as entanglement and teleportation."

The proteomics products would include protein simulation and knowledge systems, programmable protein assays that could be used to diagnose diseases and to "destroy cancers," contamination detectors, and "intelligent active aromatic arrays."  The genomics products would include DNA analysis and knowledge systems, programmable DNA and RNA, DNA manufacturing systems, and biometric sensors.  The quantum computing products would include quantum cryptography with teleportation, and neural networks composed of quantum components that would be a "true embodiment of artificial intelligence." Finally, the community agent products would include terrorist activity

---

[2] For example, RoboSphere is reported as the name for the activity on petitioner's 2011 Schedule C, while Ovium is reported as the name on his 2012 Schedule C.  The principal business for each is listed as "Internet Technology Product Development" on the 2011 and 2012 Schedules C.  Petitioner explained at trial that the nomenclature was insignificant to him.

[3] We note in addition that petitioner did not proffer any business plan for RoboSphere.

[*4] prediction services, equities projection analysis, and protein community simulation, powered by a self-organizing algorithm "embodied by neural networks."

To accomplish these scientific breakthroughs and roll out the wide range of products, the Business Overview dedicated one page to the manufacturing process using a "fullerene scaffold assembly." The Strategic Business Plan also identified Ovium's management team, including petitioner as the chief executive officer and chief technology officer, Wennie Wu as the president and chief operating officer, William Manger as chief counsel, and Irving Reed as chief consultant.

Mr. Manger was an attorney with corporate, franchise, and securities law experience. Mr. Reed was a retired professor of electrical engineering at USC, best known for creating error correcting communications codes and the logical design of digital computers. The Strategic Business Plan does not describe the roles of, or work performed by, Mr. Manger or Mr. Reed.

Ms. Wu was a scientist with teaching experience in protein crystallization and nanometer protein imaging techniques, and professional experience in optical computing and satellite communications. Ms. Wu met frequently with petitioner during the years at issue, on most occasions having dinner and attending a movie with him on weekend nights.

In 2010 Ovium entered into a consulting contract with International Innovative Institute Corp. (IIIC), an entity for which Ms. Wu was "Chairman and CEO." The contract provided that Ovium would provide IIIC with consulting services, while requiring petitioner to maintain a home office. The contract required IIIC to pay Ovium a minimum of $1,000 per year but did not set hourly or project-based rates of pay and stated the contract would continue "until payments do not continue."

Ms. Wu wrote a check to petitioner individually, dated June 15, 2009, for $1,350. The memo line on the check indicates it was for "Website of III." A November 28, 2011, cashier's check for $500, payable to Ms. Wu, was jointly endorsed by her and petitioner and deposited into petitioner's personal account on January 3, 2012. A cashier's check for $1,070 dated October 5, 2012, and payable to petitioner was deposited into his personal account on that date. Two $1,000 checks written by Ms. Wu to petitioner dated November 1 and December 1, 2012, were

**[*5]** deposited into his personal account near those dates. Other than the check written in 2009, none of the checks carried any indication of its purpose on the memo line. None of the foregoing checks was reported as Schedule C gross receipts for taxable year 2009, 2011, or 2012.

### III.   *Petitioner's Residence*

During the years at issue petitioner maintained two apartments: one in northern California and one in southern California. Petitioner spent approximately 70% of his time in northern California. The remainder of his time, often weekends, was spent in southern California, where he maintained a home office. For the southern California apartment lease, petitioner paid $19,000 in rent in 2011 and $20,025 in rent in 2012.

### IV.   *Petitioner's Income Tax Returns*

Petitioner timely filed his federal income tax returns for 2011 and 2012. He reported his occupation as "information engineer" and "data scientist" on his 2011 and 2012 returns, respectively.

For taxable years 2005 through 2015, petitioner reported the following amounts on his federal income tax returns:

| Year | Wages | Gross Receipts | Cost of Goods Sold | Total Expenses | Home Office Expense | Profit/ (Loss) |
|------|-------|----------------|--------------------|----------------|--------------------|-----------------|
| 2005 | Unknown | | | | | ($32,466) |
| 2006 | — | $21,650 | $1,390 | $24,145 | Unknown | (3,885) |
| 2007 | $39,769 | 21,800 | 678 | 9,742 | $11,380 | -0- |
| 2008 | 59,632 | — | — | 15,256 | — | (15,256) |
| 2009 | — | — | — | 20,483 | — | (20,483) |
| 2010 | 17,500 | — | — | 19,057 | — | (19,057) |
| 2011 | 120,307 | — | — | 30,208 | — | (30,208) |
| 2012 | 134,068 | — | — | 33,142 | — | (33,142) |
| 2013 | 157,903 | 9,275 | — | 45,675 | — | (36,400) |
| 2014 | 137,517 | 22,125 | — | 52,080 | — | (29,955) |
| 2015 | — | 16,000 | — | 15,687 | — | 313 |

On Schedule A, Itemized Deductions, attached to his 2011 return, petitioner claimed $19,176 in miscellaneous itemized deductions, including $6,296 in unreimbursed employee expenses, $40 in tax preparation fees, and $12,840 in "office" expenses. On Schedule A

**[*6]** attached to his 2012 return, petitioner claimed $24,387 in miscellaneous itemized deductions, including $6,947 in unreimbursed employee expenses, $40 in tax preparation fees, and $17,400 in "office" expenses. Of the amount reported as "office" expenses for each year at issue, $12,840 reflects the rent expense for the southern California apartment.

V.     *Examination of Petitioner's Returns*

Respondent selected petitioner's 2011 return for examination in 2013, and in 2014 the examination was expanded to include the 2012 return. During the examination petitioner provided undated spreadsheets documenting travel and entertainment expenses and a mileage log. Petitioner also provided an undated list of meetings he attended, including locations, the names of other attendees, and the business purposes. Additionally, he provided receipts and credit card statements for the expenses.

Respondent subsequently issued a notice of deficiency disallowing (1) all of petitioner's reported Schedule C expenses on the basis that petitioner was not engaged in an active trade or business for profit and (2) $12,840 in "office" expenses claimed as Schedule A miscellaneous itemized deductions on the basis that they were personal rent expenses.

OPINION

I.     *Burden of Proof*

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer bears the burden of showing those determinations to be erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer likewise bears the burden of proving his or her entitlement to deductions allowed by the Code. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). Because respondent determined that petitioner did not engage in the Ovium activity for profit, petitioner bears the burden of proving otherwise. Petitioner does not contend that the burden of proof should shift to respondent under section 7491(a).

II.     *For-Profit Business*

Section 162 generally allows deductions for ordinary and necessary business expenses incurred in carrying on a trade or business.

[*7] An activity must be conducted with continuity and regularity and with the primary purpose of realizing income or profit in order to constitute a trade or business under section 162. *Commissioner v. Groetzinger*, 480 U.S. 23, 35 (1987); *Wolf v. Commissioner*, 4 F.3d 709, 713 (9th Cir. 1993) (holding that profit means economic profit, independent of tax savings), *aff'g* T.C. Memo. 1991-212. Absent a profit motive, no deduction attributable to such activities is allowed, except as permitted by section 183(b). § 183(a). Section 183(b) allows deductions that would be allowable without regard to whether the activity was engaged in for profit, and a deduction equal to the amount of deductions that would be allowable only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity exceeds the deductions allowable without regard to profit motive.

An activity not engaged in for profit is "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." § 183(c). For expenses to be fully deductible under section 162 or 212, a taxpayer must demonstrate that he is engaged in the activity with the "predominate, primary or principal" objective of making a profit. *Wolf v. Commissioner*, 4 F.3d at 713. The taxpayer's expectation of profit need not be reasonable but must be held in good faith. *Allen v. Commissioner*, 72 T.C. 28, 33 (1979); Treas. Reg. § 1.183-2(a).

The regulations provide a nonexclusive list of factors to be weighed when considering whether a taxpayer is engaged in an activity for profit. Treas. Reg. § 1.183-2(b). These factors are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or the taxpayer's advisers; (3) the time and effort the taxpayer expends in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, that are earned from the activity; (8) the taxpayer's financial status; and (9) elements of personal pleasure or recreation involved in the activity. *Id.* Greater weight is given to these objective factors than to the taxpayer's statement of intent. *King v. Commissioner*, 116 T.C. 198, 205 (2001); Treas. Reg. § 1.183-2(a) and (b). No single factor is determinative of intent. *Westbrook v. Commissioner*, 68 F.3d 868, 876 (5th Cir. 1995), *aff'g* T.C. Memo. 1993-634.

**[\*8]**   A.   *Manner in Which the Taxpayer Carries On the Activity*

The taxpayer's carrying on an activity in a businesslike manner, through maintaining complete and accurate books and records, conducting the activity in a manner similar to profitable activities of the same nature, and making adjustments in operations to adopt new techniques or abandon unprofitable methods, is a factor that may indicate a profit objective.  Treas. Reg. § 1.183-2(b)(1).

In conducting his Ovium activity, petitioner did not maintain complete and accurate records.  There is no evidence that he maintained a separate bank account for the activity.  He failed to maintain books of account or business records.  Rather, petitioner presented spreadsheets that did not purport to have been created at or around the time the transactions recorded occurred.  At trial petitioner contended that his actual losses for 2011 and 2012 were $59,130 and $52,060, respectively, rather than the $30,208 and $33,142 reported on his 2011 and 2012 returns, respectively.  He explained that he had lost track of various payments.

A businesslike operation typically involves a business plan.  *See, e.g.*, *Wesinger v. Commissioner*, T.C. Memo. 1999-372.  Businesslike conduct is characterized by a thorough investigation of the profitability of a proposed venture, as well as adjustments to improve profitability as issues arise over time.  *See Ronnen v. Commissioner*, 90 T.C. 74, 93 (1988); *Taube v. Commissioner*, 88 T.C. 464, 481–82 (1987).

Before the years at issue, petitioner prepared a "Strategic Business Plan" and "Business Overview" for Ovium.  Neither document included more than industry buzzwords and general aspirations.  At various points the Strategic Business Plan describes Ovium as a "nanotechnology enterprise" developing "self organizing nanocomponents," "focused on the development of a quantum computer" using "communities of protein 'nanorobots'" for the "construction and maintenance of the nanocomputer."  The Strategic Business Plan projected rapid technological breakthroughs: the completion of a quantum computer prototype within one year, a nanorobot assembly prototype within two years, a nanocomputer prototype within three years, and a bacterial computer within five years.

The Business Overview discusses Ovium's projected successes across multiple widely varying areas of study, including the creation of "[h]olographic immersion systems for a new generation of virtual

**[*9]** reality," "stealthy antennae designs of unsurpassed jamming resistance," nanocomputer-produced antibodies, programmable DNA, and artificial intelligence. While full of projected technological advances, the Strategic Business Plan and Business Overview fall short with respect to providing a roadmap for their completion, managing losses before profitability, or providing insight into what exactly petitioner's business was accomplishing. The Strategic Business Plan likewise did not provide budgets or analyses demonstrating active financial management. *See Foster v. Commissioner*, T.C. Memo. 2012-207.

In five of the six years preceding the years at issue petitioner reported substantial losses totaling $91,147. (In the remaining year— 2007—he reported breaking even.)[4] For the years at issue he reported even greater losses: $30,208 for 2011 and $33,142 for 2012.[5] After reporting gross receipts of just over $20,000 in both 2006 and 2007, he reported no gross receipts from 2008 through the years at issue.[6]

Petitioner's failure to produce any significant revenue underlay his failure to earn a profit. *See Foster v. Commissioner*, T.C. Memo. 2012-207; *Dodge v. Commissioner*, T.C. Memo. 1998-89, *aff'd*, 188 F.3d 507 (6th Cir. 1999) (unpublished table decision). He did not provide testimony or other evidence showing that he examined the profitability of his venture, despite years of losses. Nor did petitioner testify that he spent any time adjusting his system or adopting new methods to

---

[4] At trial petitioner claimed that a $1,350 check Ms. Wu wrote him in June 2009 that was deposited into his personal account represented overlooked gross receipts for the Ovium activity. Even if we accepted petitioner's claim, the losses for 2009 would still exceed $89,000.

[5] As noted, at trial petitioner claimed these losses were even greater: $59,130 for 2011 and $52,060 for 2012.

[6] At trial petitioner contended that a November 28, 2011, cashier's check for $500 made out to Ms. Wu, which was endorsed by her and petitioner jointly and deposited into petitioner's personal bank account on January 3, 2012, was overlooked gross receipts attributable to 2011. Similarly, petitioner contended that a cashier's check and two checks drawn on Ms. Wu's bank account, totaling $3,070, that were deposited into his personal account, represented overlooked gross receipts in that amount for 2012. Even if we were to accept petitioner's claims, our view of the evidence would not change for two reasons. First, the amount of the purportedly overlooked gross receipts is insignificant in relation to the losses reported for those years. Second, these overlooked gross receipts came to light only when petitioner's 2011 and 2012 returns were being examined. Consequently, they have no bearing on whether petitioner had a good faith expectation of profit for the years at issue when he filed his returns for those years.

[*10] improve profitability. Petitioner's apparent indifference to the activity's mounting losses and lack of revenue, as of the years at issue, weighs heavily against any finding that petitioner had a good faith expectation of profit in those years. On balance we are not persuaded that petitioner carried on his Ovium activity in a businesslike manner. This factor favors respondent.

### B. *Expertise of the Taxpayer and His Advisers*

The taxpayer's extensive study of the activity's accepted business practices, or consultation with experts, may indicate a profit objective where the taxpayer conducts the activity in accordance with such practices. Treas. Reg. § 1.183-2(b)(2). The type and quality of advice that a taxpayer seeks from experts is important to the analysis. *See Engdahl v. Commissioner*, 72 T.C. 659, 668 (1979) (observing that informal and continuous consultations with experts demonstrate an intent to conduct a business for profit).

Petitioner has a Ph.D. in electrical engineering and wrote his Ph.D. dissertation on the "theoretical foundations for the implementation of quantum spin in computational algorithms for compression, error correction and cryptographic coding." Petitioner introduced receipts for the purchase of two books covering subjects relevant to Ovium's work, suggesting petitioner spent additional time studying the subject matter, but the record does not indicate that petitioner spent an extensive amount of time studying the subject matters for Ovium's work.

During the years at issue petitioner maintained frequent contact with Ms. Wu, who had teaching experience in protein crystallization and nanometer protein imaging techniques, and professional experience in optical computing and satellite communications. But petitioner's testimony and trial exhibits failed to illuminate the nature of his relationship with Ms. Wu, professionally or personally. The Strategic Business Plan does not outline the work she was to perform. On brief petitioner describes Ms. Wu as Ovium's "most persistent client" but also as an "unpaid participant in soliciting investors." Petitioner conceded that most of his reported entertainment expenses related to Ms. Wu involved movie tickets on weekend nights and that he and Ms. Wu were friends. The evidence petitioner presented fails to provide a clear picture regarding Ms. Wu's status as a client, an employee, or a personal friend, and what role she filled for Ovium.

**[*11]** Petitioner also provided a list of meetings he held during the years at issue, including the participants and the business purposes. While the business purposes listed often overlap with objectives identified in the Strategic Business Plan, we have been presented with no information regarding the participants' expertise or business experience. This factor favors respondent.

C.    *Time and Effort Expended by the Taxpayer in Carrying On the Activity*

The taxpayer's devotion of time and effort to carrying on an activity may indicate a profit motive, particularly where the activity lacks substantial personal or recreational aspects. Treas. Reg. § 1.183-2(b)(3). Petitioner did not testify regarding the hours he worked on the Ovium activity during the years at issue, but he provided timesheets for his employment with SRA OSS, which indicate he worked there, on average, in excess of 50 hours per week. In contrast petitioner provided no testimony or supporting evidence regarding his work for Ovium, or that he hired any individuals to work on his behalf. Rather, petitioner testified about his frequent travel between the Bay Area and southern California, as well as the meals, movies, and events he attended with Ms. Wu. This factor favors respondent.

D.    *Expectation that Assets Used in Activity May Appreciate in Value*

An expectation that assets used in the activity will appreciate may indicate a profit motive even if the taxpayer derives no profit from current operations. *Id.* subpara. (4). "The term 'profit' encompasses appreciation in the value of assets, such as land, used in the activity." *Id.* A profit motive, however, may be inferred from anticipated appreciation of the activity's assets only where the appreciation exceeds operating expenses and would be sufficient to recoup the accumulated losses from prior years. *See Golanty v. Commissioner,* 72 T.C. 411, 427–28 (1979), *aff'd,* 647 F.2d 170 (9th Cir. 1981) (unpublished table decision).

The only significant assets held by Ovium were computer servers and networking components. Petitioner presented no reason to suggest Ovium's assets would appreciate in value, nor did he express an expectation that they would do so. This factor favors respondent.

**[\*12]** E.      *Success of the Taxpayer in Carrying On Similar or Dissimilar Activities*

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable."      Treas. Reg. § 1.183-2(b)(5).  Petitioner is a successful IT professional with years of experience in the field and a relevant educational background.  While he has employment and consulting experience with for-profit enterprises as an IT professional, petitioner's work experience does not span all areas of expertise covered by Ovium's proposed work.  With respect to profitability, petitioner has not provided evidence to the effect that he has ever operated a business or turned an unprofitable business towards profitability.  This factor is neutral.

F.      *Taxpayer's History of Income or Losses with Respect to the Activity*

"A series of losses during the initial or start-up stage of an activity may not necessarily be an indication that the activity is not engaged in for profit."  *Id.* subpara. (6).  Sustained losses continuing beyond the customary period necessary to bring the operation to profitable status, if not explainable, may indicate a lack of profit motive.  *Id.*  While losses during the startup stage of an activity may not necessarily indicate the absence of a profit motive, a history of large losses over many years is persuasive evidence that the taxpayer lacked a profit motive.  *Golanty*, 72 T.C. at 426; *Foster*, T.C. Memo. 2012-207.

For taxable years 2005 through 2015, petitioner incurred losses totaling $220,539, while reporting zero gross receipts from 2008 through 2012.  Petitioner did generate $21,650 and $21,800 in gross receipts for 2006 and 2007, respectively.  He again reported gross receipts for 2013 through 2015 in amounts similar to, or less than, those generated in 2006 and 2007. Between 2007 and 2014, with one exception, petitioner's expenses grew each year.  The lack of an upward trajectory in gross receipts to match or outpace the upward trajectory in expenses belies the notion that petitioner was experiencing losses only during a startup period or that profits might recoup his losses from prior years.  This factor favors respondent.

**[\*13]** G. *Amount of Occasional Profits, if Any, Which Were Earned*

The amount of profits in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent. Treas. Reg. § 1.183-2(b)(7). The regulation further provides: "[A]n opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that the activity is engaged in for profit even though losses or only occasional small profits are actually generated." *Id.*

Petitioner did not earn a profit during either of the years at issue; indeed, he did not report any gross receipts at all for 2011, and for 2012, only $3,070—if one accepts his claim that he overlooked gross receipts in that amount when he filed his return. For taxable years 2005 through 2015 petitioner earned a profit for only 2015—of $313. This factor favors respondent.

H. *Financial Status of the Taxpayer*

Substantial income from sources other than the activity may indicate that the activity is not engaged in for profit. *Id.* subpara. (8). In the five years preceding the years at issue, petitioner's wage income fluctuated; in two of these years, he had no wage income. For the years at issue, however, he had wage income of $120,307 and $134,068 for 2011 and 2012, respectively. Thus, the losses from the Ovium activity in those years generated substantial tax benefits. This factor favors respondent.

I. *Elements of Personal Pleasure or Recreation*

Personal motives and recreational elements enjoyed in carrying on an activity may indicate that the activity is not engaged in for profit. *Id.* subpara. (9). Satisfaction from the work, rather than a profit motive, may account for a taxpayer's persistence in certain loss-generating activities. *See Foster*, T.C. Memo. 2012-207. An activity is not classified as a hobby simply because the taxpayer finds it pleasurable. *Jackson v. Commissioner*, 59 T.C. 312, 317 (1972).

Petitioner provided a substantial number of receipts for his Ovium activity for the years at issue. The receipts are for fast food and restaurants, coffee shops, bakeries, grocery stores, movie theaters, and hockey games. The receipts further reflect that petitioner made retail purchases at Walmart, Uniqlo, the North Face, REI, and BevMo!, and took a trip to Japan. Petitioner has failed to demonstrate a business

**[\*14]** purpose for these abundant expenditures for food, entertainment, and travel. By contrast, we searched in vain for any receipts for purchases of raw materials or equipment necessary for Ovium's purported business activity. We conclude that a significant portion of the expenditures for the Ovium activity was personal. This factor favors respondent.

J.   *Conclusion*

Considering all the facts and circumstances and weighing the factors analyzed above, we hold that petitioner did not conduct his Ovium activity in a businesslike manner and he did not engage in that activity with the requisite profit objective during the years at issue. We accordingly sustain respondent's determination that petitioner is not entitled to deductions under section 183(b) for his reported Schedule C expenses for 2011 and 2012.[7]

III.   *Home Office Deductions*

Generally, the expenses of maintaining a household, including amounts paid for rent, water, utilities, and the like, are not deductible. Treas. Reg. § 1.262-1(b)(3). Section 280A(a) provides that "no deduction otherwise allowable under this chapter shall be allowed with respect to the use of a dwelling unit which is used by the taxpayer during the taxable year as a residence." If, however, a portion of the residence is used as a place of business, a share of the expenses properly attributable to the portion of the property used for the business may be deductible as a business expense, subject to the rules of section 280A. § 280A(c).

No deduction is allowed with respect to a home office unless "allocable to a portion of the dwelling unit which is exclusively used on a regular basis" as the taxpayer's principal place of business. § 280A(a),

---

[7] Respondent argues, in the alternative, that even if petitioner intended to earn a profit from Ovium, his expenses should be amortized as startup expenses. *See* §§ 195(a), (b), and (c)(1), 162(a); *Jackson v. Commissioner*, 86 T.C. 492, 514 (1986) (finding no deduction under section 162 unless related to an ongoing business), *aff'd*, 864 F.2d 1521 (10th Cir. 1989). We need not address this argument because, as explained above, we find that petitioner did not conduct the Ovium activity for profit; therefore, petitioner's expenses are not eligible for amortization as section 195 startup expenses. *See* § 195(b)(1), (c)(1)(A) (providing amortization is allowed only for expenses that are incurred to create new trade or business); *Commissioner v. Groetzinger*, 480 U.S. at 35 (finding that a profit motive is required to have a trade or business); *Wilmot v. Commissioner*, T.C. Memo. 2011-293 (finding amortization under section 195 need not be addressed where activity is not conducted for a profit).

[*15] (c)(1). If a taxpayer fails to provide the Court with evidence of the extent to which he or she used a portion of the home exclusively, we cannot estimate the deductible portions of his expenses. *See Sam Goldberger, Inc. v. Commissioner*, 88 T.C. 1532, 1556–57 (1987).

Petitioner deducted $12,840 in rent expenses for his southern California apartment as "office" expenses under Schedule A miscellaneous itemized deductions for 2011 and 2012. At various points, petitioner has argued that the "office" expense was a Schedule C expense incurred in connection with Ovium,[8] and at other points he has argued that it was a Schedule A expense incurred in connection with his employment at SRA OSS.[9] We may consider each of these activities, because expenses attributable to the use of a home office may be deductible in conducting two or more separate business activities. *Hamacher v. Commissioner*, 94 T.C. 348, 356 (1990). However, if any activity conducted in the home office fails to meet the requirements of section 280A(c)(1), none of the activities meets the exclusive use requirement for the home office. *Hamacher*, 94 T.C. at 356.

With respect to the Ovium activity, petitioner may deduct only an expense allocable to a portion of the apartment that is exclusively used on a regular basis as (1) the principal place of business for any trade or business of the taxpayer or (2) a place of business which is used by patients, clients, or customers in meeting or dealing with the taxpayer in the normal course of his or her trade or business. § 280A(c)(1)(A) and (B). We have held that the Ovium activity lacked a profit motive; it is therefore not a trade or business. *See Commissioner v. Groetzinger*, 480 U.S. at 35. As both factors under section 280A(c)(1) require the existence of a trade or business, we hold that petitioner's use of the home

---

[8] In this regard, we note petitioner testified that the Ovium activity was conducted from his southern California apartment. However, the business addresses listed for the activity on the Schedules C for 2011 and 2012 were in Palo Alto, California, and Pasadena, California, respectively.

[9] Petitioner also asserts on brief that he was an independent contractor for SRA OSS, not a W–2 employee, and that expenses incurred in connection with SRA OSS should therefore be reflected on his Schedules C. However, petitioner's work agreement with SRA OSS, which he signed, reflects his status as a W–2 employee, and petitioner also stipulated his employee status with SRA OSS. A stipulation is treated as a conclusive admission by the parties, and may not be contradicted, except as justice requires. Rule 91(e); *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1547 (9th Cir. 1987) ("A stipulation will generally be enforced unless manifest injustice would result."), *aff'g* T.C. Memo. 1986-23. Accordingly, petitioner is precluded from claiming he was not an employee of SRA OSS for the years at issue.

**[*16]** office in connection with his Ovium activity does not comply with section 280A(c)(1).

Because the Ovium activity fails to meet the requirements of section 280A(c)(1), any other activity conducted in the same space would fail to meet the exclusive use requirement. Petitioner claims to have used the home office of his southern California apartment for both the Ovium activity and his employment with SRA OSS. Therefore, petitioner's use of his home office in connection with his employment at SRA OSS does not comply with section 280A(c)(1).

Petitioner has not satisfied the exclusivity requirement of section 280A(c)(1), and pursuant to section 280A(a), his home office deductions are not permitted. We therefore sustain respondent's determination that petitioner's home office deductions are not permitted under either Schedule A or C.

IV.    *Conclusion*

We have considered all remaining arguments the parties made and, to the extent not addressed, we conclude they are irrelevant, moot, or meritless.

To reflect the foregoing,

*Decision as to the deficiencies will be entered for respondent.*